David Stebbins (pro se Plaintiff)      123 W. Ridge Ave., APT D, Harrison, AR 72601
(870) 212-4947                         acerthorn@yahoo.com

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

DAVID STEBBINS,                                    PLAINTIFF **FILED**

VS.                        _____      **JAN 10 2024**

THIAGO CHAGAS GARCIA BAZ                           DEFENDANT DISTRICT COURT
                                                   NORTH DISTRICT OF CALIFORNIA



## COMPLAINT

Comes now, *pro se* Plaintiff David Stebbins, who hereby submits the following Complaint against defendant Thiago Chagas Garcia Baz for thirteen (13) complaints of copyright infringement, one (1) count of libel, and one (1) count of DMCA Misrepresentation in violation of 17 USC § 512(f)(2).

### I: PARTIES TO THE CASE

1.      I am a Youtuber and Twitch streamer who goes by the alias "Acerthorn." My Youtube channel can be found at the url of www.youtube.com/@acerthorn, and my Twitch channel can be found at the url of www.twitch.tv/acerthorn.

2.      The Defendant used to have a YouTube channel of his own before it was terminated after he received four different copyright strikes from me. This channel went by the name "Templar Dragonknight, Son of Thudner." He is a resident of Brazil. According to his DMCA Counter-Notification, he can be served with process at the following address:

> Guairá street #51
> Apartment 112
> São Paulo, SP
> Brazil

### II: JURISDICTION AND VENUE

3.      This Court has subject-matter jurisdiction over this case because, as a case for copyright infringement, it has federal question jurisdiction.

4.      Venue and personal jurisdiction is proper in this court pursuant to the statute of 17 USC § 512(g)(3)(D).

3:23-cv-00322-TLT                        -1-                            Complaint

(a)    The defendant is a foreign national. Specifically, he is a resident (and presumably citizen) of Brazil.

(b)    When he issued his DMCA Counter-Notification, he checked a box that said "I consent to the jurisdiction of the Federal District Court for the district ... if my address is outside of the United States, the judicial district in which YouTube is located, and will accept service of process from the claimant." This consent was required in order for the counter-notification to be legally valid, under § 512(g)(3)(D).

(c)    YouTube is headquartered in San Bruno, CA, which is part of the Northern District of California. Therefore, this court has personal jurisdiction over this case.

### III: FACTS OF THE CASE

5.    The following facts are necessary to understand this case.

### III-1: The Copyrighted Works

6.    I own the following copyrights, which are relevant to this action:

### III-1-A: Acerthorn Channel Icon #6

7.    On or around May 31, 2019, I created a 2D image that I would then proceed to use as my channel icon for several years. I dubbed this image "Acerthorn Channel Icon #6," and registered the copyright under that name.

### III-1-B: The YouTube video "Why I Demand Civility in the Comments of my Videos" (aka "the Civility video")

8.    On October 17, 2020, I published a video to my YouTube channel called "Why I Demand Civility in the Comments of my Videos." For simplicity's sake, I will refer to it as "the Civility video" for the rest of this Complaint. The video can be found at the following url:

https://www.youtube.com/watch?v=Pynxo57AB5s

9.    This video was created by me, and so contains human authorship. It has minimum creative spark because it contains multiple opinions of mine, as well as explanations as to why I hold the opinions I hold. The Court need only watch the video itself to see for itself that the way I express my opinions in this video constitutes minimum creative spark.

III-1-C: The YouTube Video "Elden Ring Sucks, and Here's Why" (aka "the Elden Ring video")

10.     On March 23, 2022, I posted a video to my YouTube channel called "Elden Ring Sucks, and Here's Why." For simplicity's sake, I will refer to it as "The Elden Ring video" for the rest of this Complaint. The video can be found at the following url:

https://www.youtube.com/watch?v=m0iT_TFcaFE

11.     Like the Civility video before it, this video contains minimum creative spark because I fill the video with opinions of mine, as well as explanations as to why I hold the opinions I hold. Just like with the civility video, I feel the Court need only watch the video itself to see for itself that the way I express my opinions in this video constitutes minimum creative spark.

III-1-D: Ten Copyrighted Songs

12.     In February of 2023, I contracted with a composer in Argentina by the name of Augustin Navarro to compose ten original songs for my channel.

13.     The titles for these ten songs are as follows:

   (a)     Acer's High
   (b)     Long Prat Fall
   (c)     Sigh of Relief
   (d)     Section of Life
   (e)     Sample of Life
   (f)     Epic Moment
   (g)     Blinding Rage
   (h)     There Is No Hope
   (i)     Smile on My Face
   (j)     Ready for Action

14.     You can listen to these songs by going to the following unlisted playlist on YouTube: https://www.youtube.com/playlist?list=PLpL3n7W6QqgBB_ZRVducMkGN3CRaz3isQ However, you will have to pay my channel at least $1 per month to be able to listen to these songs. Maybe, once this case gets underway, I can file under seal so the Court can hear these songs for free without me giving away free samples to the public.

15.     These were works for hire, which means that I own 100% of the copyright to these songs, and he only received a flat fee for his labor.

16.     These songs are legally eligible to be works for hire because they were intended to be used as background music for my YouTube channel. Therefore, they qualify as "supplementary works," specifically they were composed "as a part of a motion picture or other audiovisual work," thereby meeting the legal definition to be a work for hire under 17 USC § 101.

17.     Barring that, Navarro and I signed a contract, written by an American attorney at our behest, stating that, even if these songs are not legally eligible to be works for hire, he was still *selling* the copyrights to me. When I showed this contract to Identifyy[1], they accepted this contract as proof that I was indeed the sole copyright owner (although my attempts to do business with them fell through the cracks for other reasons), so I am confident this Court will accept this contract as proof that I am copyright holder, once I disclose it in discovery.

18.     In any event, I registered the copyright for these ten songs before I began using them in any of my videos. The registration number for these ten songs is Sru001538491. The effective date of registration is March 5, 2023.

19.     Although I have registrations for these ten songs, and these songs will invariably be included in all of my YouTube videos going forward (meaning anyone who copies any portions of my videos will, almost invariably, be copying portions of these songs as well), it is not necessary for a secondary user to criticize these songs, specifically, in order to be eligible for the "fair use" defense. My *registration* of these ten tracks can be used as a work-around to keep me from expensively having to *register* each individual video every time it gets infringed upon, but it is not a work-around that gets around fair use law. As long as a secondary user makes a fair use of whatever videos contain these songs, their use of the music itself should also be classified as fair use.

20.     However, that still requires they actually ***make fair use*** of the videos, and as this Court is surely aware (and which many people on the Internet frequently get wrong), fair use requires more than just providing criticism. Criticism is certainly a good first step to fair use, but it's only

---

1   Identifyy – spelled with two Y's at the end – is an online company that assists musical artists in registering their songs for YouTube's "Content ID" system, so they can place copyright claims on videos which use those songs.

one factor.

<u>III-1-E: the YouTube video "You Should Side with the Stormcloaks, and Here's Why" (aka "the Stormcloaks Video")</u>

21.     On March 25, 2023, I published a video on my channel called "You Should Side with the Stormcloaks, and Here's Why." For simplicity's sake, I will refer to it as "the Stormcloaks video" for the rest of this complaint. You can see this video at the following url: https://www.youtube.com/watch?v=skZOI4lDKhl

22.     This video was dedicated to discussing the lore and story of a video game called "The Elder Scrolls V: Skyrim." Specifically, it discussed the civil war that happens during that game whereby an army of rebels known as the Stormcloaks are attempting to overthrow the existing Empire. As the title of this video suggests, I side with the Stormcloaks while playing this game, and in this video, I argue my case for why people should do the same.

23.     Throughout this video, I use all ten of my copyrighted songs as background music. I begin with "Long Pratt Fall" in the first 14 seconds, then switch to "Acer's High" for timestamps 0:14 – 1:33, then to "Smile on my Face" during timestamps 1:34 – 5:07, and so on. This means that anyone who copies 100% of the March 25 video also necessarily infringes on *ten different copyrights*, not just one. Now again, just like I said earlier, this doesn't matter if the secondary use is a fair use, but again, fair use requires more than *just* criticism alone.

<u>III-1-F: The songs, the icon, and all three videos, are all unpublished.</u>

24.     It is also worth noting that all ten songs, as well as all three videos, all fit the legal definition of "unpublished." This is because these songs were only ever published on YouTube. A work is not considered "published" simply because it is posted online. This is established by "Circular 66," which is published by the US Copyright Office. You can find that document here: https://www.copyright.gov/circs/circ66.pdf

25.     On pages 4-5 of that circular, it says in pertinent part …

> "The fact that a work has been placed online or posted on a website does not necessarily mean that the work has been published. The Office considers a work published when copies of it are distributed to the public by sale or other transfer of ownership if the copyright owner authorizes the end user to retain copies of the work. ***Merely displaying or performing a work online generally does not***

*constitute publication. … Just because an end user can technically reproduce a work does not necessarily mean that the work has been published.* A copyright owner must have expressly or implicitly authorized users to make *retainable copies* of a work by downloading, printing, or other means for the work to be considered published.

The concepts of authorization and publication can be complicated and may have serious consequences for the author or copyright owner. For this reason, *the Office generally lets the applicant decide whether a particular work is published or unpublished.* In making this determination, you may wish to consider the following general guidelines.

• Work made available only by streaming. *Streaming is a performance*, which, in and of itself, *does not constitute publication*, because, as a practical matter, the end user does not retain a copy of the work when the performance ends.

• Work for which downloading or reproduction is expressly prohibited. *If there is a notice on a website in the terms of service for the site or another obvious place indicating that a work or the content on the site cannot be downloaded, printed, or copied, the work or content may be deemed unpublished*, because the end user is not authorized to download, print, or otherwise distribute copies.

…

• Work made available through an implied license. *It may be unclear* whether the copyright owner authorized the public to retain copies of the work if a work is posted on a website and there is no evident statement in the terms of service for the site—on the web page where the work is displayed or elsewhere—stating that the work can be downloaded, copied, forwarded, shared, or printed."

26.    Important sections of that excerpt were bolded and italicized for emphasis.

27.    Applying these rules to the instant case, none of the copyrighted works in question here qualify as "published." They are merely "performed" on my YouTube channel, not licsensed or sold. There was no option to download these works for offline viewing, except by third party means. YouTube expressly forbids downloading any videos off of their site except through the methods they themselves provide[2], nor have I hosted any of these songs, or March 25 video, on

_____

2   See https://www.youtube.com/t/terms:

"The following restrictions apply to your use of the Service. You are not allowed to:
1. access, reproduce, download, distribute, transmit, broadcast, display, sell, license, alter, modify or otherwise

any other services besides Twitch or YouTube, so there is no way I posted it to any website which explicitly authorizes third party downloading.

28.     The closest you could get to having these streams be considered "published" is by pointing out that YouTube allows members of its "YouTube Premium" service to download videos for offline viewing. See https://www.youtube.com/premium ("Downloads Save videos for when you really need them – like when you're on a plane or commuting"). However, that still doesn't count. These so-called "downloads" are only viewable within the YouTube mobile app and, most importantly of all, are automatically deleted after a few days, because they aren't meant as a substitute for downloading of videos to get around copyright. It is meant for commuters and such, who are only without Internet for a few hours, or 1-2 days at most.

29.     In other words, the existence of YouTube Premium's download feature does not constitute publication of YouTube videos, because the videos downloaded using that feature are not "retainable." As shown above, that was an essential element in whether or not posting something on a website constitutes publication.

30.     Even if YouTube premium downloads were classified as "retainable," the fact that they can only be viewed within the YouTube mobile app means that the original infringer in this case could not possibly have used that method to create his infringing series, so it still doesn't count.

31.     The only way you can download videos off of YouTube in a way that is both retainable, and expressly authorized by the service, is if you were logged into the channel's account and download them from your YouTube Analytics page. Since the individual infringer in this case obviously cannot claim to have gotten any of my videos using that method, the videos are therefore legally classified as "unpublished" for purposes of this case.

32.     However, even if my understanding of the word "retainable" is wrong, it ultimately doesn't matter. Bear in mind that Circular 66 says that "it is unclear" whether this counts as a "publication." Earlier in that excerpt, they also stated that, whenever it is ambiguous, ***the copyright owner gets to decide*** whether it is published or unpublished! This means that the burden falls to the defendant to prove, not just that I am wrong about this, but that I am

---

use any part of the Service or any Content except: (a) as expressly authorized by the Service; or (b) with prior written permission from YouTube and, if applicable, the respective rights holders"

objectively unreasonable in forming my belief. If there is any ambiguity in the facts, my
preference is entitled deference. Therefore, the songs and videos are still legally classified as
"unpublished" and there's no two ways about it.

### III-2: Infringements by Defendant

33.     Defendant Baz has made numerous videos responding to my videos, claiming to be
"debunking" them. I disagree with his reasoning, but that is not the point of this lawsuit. The
point is that he used my copyrighted content in a way that is not fair use. He, along with
countless other YouTubers, have this delusional belief that, as long as they provide a token
amount of criticism of someone's video, there is a 100% chance that their response videos are
fair use, no ifs ands or buts, and therefore they are entitled to copy literally 100% of the original
video and completely displace the market for the original. Baz is one such delusional individual,
and his infringements of the three videos mentioned above[3], and for the reasons set forth below,
none of them qualify as fair use.

### III-2-A: Infringement #1: The Civility Response

34.     On February 23, 2021 and March 25, 2021, Baz posted a two-part response video to the
Civility video, titled "Everything Wrong with Acerthorn's Why I Demand Civility In the
Comments of My Videos," Part 1 and Part 2, respectively. For simplicity's sake, I will refer to
this 2-part response as "the Civility response" for the remainder of this case.

35.     If the videos were still publicly visible, you could view them at the following urls:

(a)     Part 1: https://www.youtube.com/watch?v=zMpSK4llj18

(b)     Part 2: https://www.youtube.com/watch?v=hVzcCMNgKy8

36.     Between both parts, 100% of my original video is used, literally every single last second
of it. Not only that, but he only marginally criticizes the video, only occasionally stopping to
make a comment. There are several moments when he plays long stretches of my video, multiple
minutes on end, without stopping to give criticism. For example, in Part 1, at timestamp 23:21 -
26:36, there's a 3 minute and 15 second stretch where he just plays my video without
interruption. Also, in Part 2, at timestamp 5:25 - 8:43, we have a 3 minute and 18 second stretch

---

3   which collectively amount to twelve different copyrighted works infringed upon, since the Stormcloaks video
    counts as ten different copyrighted works

of same. There are plenty of other examples besides these. These are just the only two examples where more than three minutes of my video were played without interruption, but there were plenty of instances where 90-120 seconds of my video were also played without interruption. At no point were any of these instances of excessive copying actually necessary to make the criticism he was making. It was just pure excess and pure greed for its own sake.

III-2-B: Infringement #2: Unauthorized and Unnecessary Use of "Acerthorn Channel Icon #6" during Part 2 of the Civility Response

37.     In addition to making a non-fair use of my Civility video, at timestamp 25:55 of Part 2 of his civility response, he also proceeded to criticize a few of the comments I left in th comment section of my own videos. While he is certainly allowed to criticize my comments, he also showed my at-the-time channel icon (Acerthorn Channel Icon #6) alongside these comments. There was absolutely no reason he needed to do that. He could very easily have placed red or black bars over the comment to obstruct it, or perhaps even cropped out the icon entirely.

38.     For a demonstrate of the latter, please see this video: https://youtu.be/G1TWOuUehzY. That is a video I posted after Baz's channel was terminated, boasting about my victory over him. At timestamp 58:19 of that video, you can see that I show one of Baz's community posts[4] where he complains about the copyright strikes he received from me. However, you will notice that carefully cropped out the left side of these comments, where his icon (which may or may not have been copyrighted, but I did not wish to take the risk) was visible. I wasn't interested in critiquing the icon, so I didn't show the icon. Instead, the only thing I showed was the thing I actually wanted to critique: The comment itself.

39.     That is what Baz should have done with my comment and icon. But he didn't. He simply displayed my icon brazenly, without criticizing it, and without any necessity to display it. Rather, pursuant to the delusional belief mentioned above about how fair use works, he believed that, since he was providing some nominal criticism towards me in any capacity, no matter how slight the quantity or quality, he automatically and necessarily had carte blanche to use whatever content of mine he so desired, without regard to necessity, excess, or anything else, simply

---

4   Text-only posts, similar to comments on videos, that are not tied to any particular videos, but are instead associated with the entire channel.

because he and many other YouTubers delusionally believe that is how fair use works.

<u>III-2-C: Infringement #3: The Elden Ring Response</u>

40.      On July 14, 2022, Baz posted a video to his channel called "Bashing Acerthorn's Stupid Political Tweets (plus his Idiotic Review of Elden Ring)." As the name suggests, the latter half of this video (specifically, beginning on timestamp 26:24) has him responding to my Elden Ring video. For simplicity's sake, I will refer to this response as "the Elden Ring response" for the remainder of this case.

41.      If the video were still publicly visible, it could be viewed at the following url:

https://www.youtube.com/watch?v=F8FCdbryyVw

42.      Just like with the civility response, Baz copies literally 100% of the original Elden Ring video, every single last second of it. This time, the original video was only 3 minutes and 49 seconds long, so the excerpts which he copies without interruption are naturally going to be much shorter, but they are still far in excess of what was actually necessary in order to make the criticism he wanted to make. For example, at timestamp 29:34 – 30:40, he plays a 1 minute and 6 second clip of my video before finally stopping to give any criticism, when he could very easily have only copied the final 12 seconds before finally pausing. Also, at 31:08 – 32:05, he plays the final 56 seconds of my video, but then proceeds to give his critique of the video as a whole, meaning he could have conceivably omitted that 56-second clip in its entirety without losing anything in the way of providing context for his criticism (which is supposedly the whole reason why some limited copying of copyrighted material is necessary to make criticism in the first place).

43.      Those two clips alone amount to 2 minutes and 3 seconds of excessive copying. Since the original Elden Ring video was only 3 minutes and 49 seconds long, that means that these two clips alone constitute a majority of the original Elden Ring video's total length! Even if you don't count the aforementioned 12 seconds mentioned above, which I concede could have reasonably been kept in order to make his criticism, the remaining 1 minute and 51 seconds of unnecessary copying still amounts to approximately 48% of the original video's length that Baz did not need at all in order to make his criticism.

<u>III-2-D: Infringements #4 - #13: The Stormcloaks Response</u>

44.    For the next ten counts of infringement, Baz proceeded to make a multi-part series responding to the Stormcloaks video. For simplicity's sake, I will refer to this multi-part series as "The Stormcloaks Response" for the rest of this case. He only managed to post three parts of this series before I had his channel terminated through DMCA Takedowns and copyright strikes, but he made it clear, in Part 1 of his series, that, once he had completed the entire series, he would have copied literally 100% of the Stormcloaks video, literally every single last second of it.

45.    If the series were still publicly visible, they could be viewed at the following urls:

    (a)    Part 1: https://www.youtube.com/watch?v=rWxBy9xY93M

    (b)    Part 2: https://www.youtube.com/watch?v=MAHQAx3U6_s

    (c)    Part 3: https://www.youtube.com/watch?v=4idQ5q8ox7Y

46.    His use of footage from my March 25 video begins at timestamp 2:47 of Part 1, at timestamp 1:21 of Part 2, and timestamp 1:21 of Part 3. Remember that it is the music, not the entire video, that I am suing over in this section of the Complaint. The Stormcloaks video is merely the video where these songs were used, so Baz's copying of the Stormcloaks video constitutes the use of my copyrighted music.

47.    In all three parts he managed to post before his channel was terminated, he played all ten of the copyrighted songs that I used as background footage for the Stormcloaks video. I will provide timestamps where all ten songs are played when the case moves onto discovery, but all ten are there.

48.    Although Baz provides *some* criticism (not really extensive or thorough criticism, but criticism nonetheless), he copies far more of the Stormcloaks video than what is actually necessary for him to make this criticism. At multiple points in his response, he plays several minutes worth of the Stormcloaks video uninterrupted, only occasionally stopping to make rebuttal arguments. Entire sections of the Stormcloaks video would be played in their entirety without him stopping once to give even a single sentence of criticism. For example, in Part 1, timestamp 27:47 – 29:23 and again at timestamp 37:46 – 39:32, my "Undisputed Facts" #1, #2, #7, #8, and #9, were all played *in their entirety* without TDSOT stopping once to give even a

single sentence of criticism!

49.     Even in sections where he stopped occasionally to provide criticism, he still copied much more of my video than was necessary to make his criticism. For example, in Part 2, at timestamp 3:41 – 8:14, there is a *four minute and 33 second stretch* of my video being played without interruption before he finally stops to make a comment! The criticism he then proceeds to give is only relevant to the eight seconds immediately before he paused. This means that there was a total of 4 minutes and 25 seconds of my footage that he could have removed from his response video because it had no bearing on any of the criticism he was providing, and he just didn't.

50.     The music that I had playing in this section of the video was "Section of Life." As you can see from the unlisted playlist provided above, that song is normally 3 minutes 8 seconds long. I had it playing on a loop in the background in this section of the Stormcloaks video (which, as the copyright holder, I was well within my right to do; no fair use necessary). This means that, in the aforementioned 4½ minute segment, Baz played *more than one hundred percent* of that copyrighted song, without stopping to give criticism once!

51.     As I sit through both of these videos, I can see that the entirety of the series is like this. He will play my Stormcloaks video in its entirety, only occasionally stopping to make criticism, but for the most part, this is hardly his video; it's *my* video with very sparse and very occasional commentary penciled into the margins.

52.     At 2:33 of Part 1, he says he will only debunk about 20 minutes of my video at a time, and at timestamp 39:52 of Part 1, he admits that there is "still plenty to come." In other words, by the time he finishes this series, he will have copied *the entirety* of my Stormcloaks video, literally every single second of it, while only responding to and criticizing a very small portion of it. He was not able to finish the series before I had his channel terminated, but he has made it clear that this is what he planned to do.

### III-3: DMCA Takedowns and Copyright Strikes

53.     On July 22, 2023, when I discovered Parts 1 and 2 of the Stormcloak Response, I performed a review of the videos for fair use as required under Lenz v. Universal Music Corp., 815 F. 3d 1145 (9th Cir. 2015) and, upon reaching a good faith determination that the two videos

did not constitute fair use, I issued a DMCA Takedown to YouTube to have these two videos removed. Part 3 of the Stormcloak Response had not been posted yet.

54.     Youtube and I had a back-and-forth conversation, and by the time we had sorted out our communication issues, Baz had posted Part 3 of the Stormcloak Response video. I therefore issued a new DMCA Takedown against it after, once again, verifying that I, in good faith, did not believe the video qualified for fair use. This time, however, Part 3 was taken down without issue, granting him a single copyright strike.

55.     Part 2 of his Stormcloak Response video was taken down at a later date, giving him a second copyright strike. He then proceeded to remove Part 1 of the Stormcloak Response series of his own accord, so he never got a copyright strike for it.

56.     I then proceeded to issue DMCA Takedown Notices for his Elden Ring Response as well as his two-part civility response. On August 24, 2023, YouTube took down his two-part Civility Response and issued him a third copyright strike (one strike between both videos), causing his YouTube channel to be terminated. On September 1, 2023, YouTube also took down his Elden Ring Response, giving him a fourth copyright strike.

57.     That has the potential to get confusing, so here is a chart that showcases each count of infringement:

| Strike | My copyrighted work(s) | Baz's video Short Name | Counter-Notification Pending? |
|---|---|---|---|
| N/a (Baz took down the video of his own accord) | Ten copyrighted songs | Stormcloaks Part 1 | No |
| 1st Strike | | Stormcloaks Part 3 | Yes |
| 2nd Strike | | Stormcloaks Part 2 | Yes |
| 3rd Strike | Civility video | Civility Response Part 1 | Yes |
| | Acerthorn Channel Icon #6 | Civility Response Part 2 | Yes |
| | | | No |
| 4th Strike | Elden Ring Video | Elden Ring Response | No |

58.     Now that Baz has issued a DMCA Counter-Notification, he no doubt seeks to have his channel unbanned. To achieve this, he would have to get at least two of his copryight strikes revoked in their entirety. Bear in mind that he has only countered three of the strikes so far. His fourth strike – the one pertaining to his Elden Ring Response – has not been countered. Therefore, no matter what happens in this case, even if he manages to prevail on Infringement #3, that strike will remain because he never countered it.

59.     Meanwhile, his third strike – the one related to his two-part Civility Response – has two videos attached to it. To get that strike revoked, *both* of those videos will have to be reinstated. This means he will have to prevail on both Infringement #1 and Infringement #2. If he prevails on #1 but not #2, that means that Civility Response Part 1 may be reinstated, but Civility Response Part 2 will not. If either of those videos remain stricken, his third strike will remain. Not to mention, because (as mentioned above) he never countered his fourth strike, that means he will also have to prevail on at least one of the two strikes related to his Stormcloak Response as well.

60.     So if Baz's goal was simply to get his channel reinstated, he has his work cut out for him.

### III-4: DMCA Counter-Notification, Libel, and DMCA Misrepresentation

61.     On January 3, 2024, I received an email from YouTube stating that Baz had issued DMCA Counter-Notifications against four of the five videos that had been stricken: All of the above-styled videos except for his Elden Ring Response. Receiving this notice prompted me to file this Complaint with this Court.

#### III-4-A: The false statement of fact regarding my beliefs

62.     However, in addition to simply pleading fair use, he also included the following statement in his Counter-Notification:

> *"The one who sent the copystrike seems to have erroneously assumed that it wasn't fair use simply because I used his content on my videos, but that's simply not true."*

63.     This is not his opinion. This is a statement of fact. He is claiming what I believe, rather than his own opinion, which is a statement of cast-iron objective fact. He is making a statement of fact about my perception of reality and my understanding of the law. Therefore, it is just as

defamatory as if he were to state I was a Nazi-sympather, or that I believe that child molestation should be legalized. Even if he never accused me of engaging in any overt actions pursuant to those beliefs, publicly stating that I hold the beliefs in the first place is still defamatory.

64.     Moreover, this is a belief that, if I did indeed hold it, would be just as delusional as his belief in the simplicity of fair use, as described in ¶ 33 above.

65.     However, this statement is demonstrably false, and made in knowing disregard to the mountains of evidence to the contrary. Therefore, it qualifies as an act of libel. Furthermore, since my alleged failure to consider fair use is material to the DMCA Takedown, that means it also qualifies as a "false material statement" for purposes of 17 USC § 512(f)(2).

66.     While I have provided numerous pieces of rebuttal evidence, one of them which is especially relevant in this particular case is the video I mentioned earlier in this Complaint, in ¶ 38 above. That video, more than anything else, is especially pertinent to the instant case, since it, more than any other public statement I have ever made on the subject of fair use, he should be privy to that video more than anything else, seeing as he was the main subject of that video. More than any other public statement about the topic of fair use, his failure to consider the contents of that video constitute "burying his head in the sand."

67.     In that video, I spent over an hour explaining in exquisite detail how his response videos fell short of the bar to be considered fair use. At no point in that 82-minute video did I state, or even imply, that I felt his videos "wasn't fair use simply because [he] used [my] content on [his] videos" (a belief that, if I did indeed hold it, would be just as delusional as his belief regarding the simplicity of fair use, as explained in ¶ 33 above). In fact, at multiple points in the video, I made statements and asked rhetorical questions which are wholly incompatible with that delusional view, including, but not limited to, such statements as ...

(a)     Timestamp 1:42 – 1:58

"I thoroughly explained that playing *the entirety of my video*, just with occasional commentary over it, is a surefire way to kill your case for fair use"). The emphasized words "the entirety of my video" clearly imply that only taking short excerpts from my video is acceptable.

(b)     Timestamp 28:54 – 29:08

"He provided *some* criticism. The problem is that he copied way, way more of my Stormcloaks video than he actually needed in order to make his criticism"). This line clearly shows that it is the amount copied, not simply that he copied any at all, that kills his case for fair use.

(c)      Timestamp 40:04 – 40:37

"Now the thing that's most frustrating about all of this is that Templar had a case for fair use practically gift-wrapped for him. Literally all he had to do was take out the parts of my video that he didn't need in order to make his criticism. If he had simply done that, he would have had a much stronger case."

(d)      Timestamps 31:35 – 31:49 and 1:11:33 – 1:11:55, two times where I concede that he might have had a colorable claim to fair use if he had simply used less of my videos before giving the criticism, clearly showing that I concede that some limited copying is allowed under fair use, just not the unlimited copying that he actually engaged in.

(e)      Timestamp 54:30 – 56:08

"I cannot emphasize this enough: YOUTUBE'S OWN LAWYERS agreed with me that it is not fair use! How can my case possibly be frivolous?! ... even if by some miracle, later down the line, it turns out that it isn't fair use, how can you possibly say that I had an objectively unreasonable basis for thinking it wasn't when YouTube's own lawyers agreed with me after a manual review?!"

68.      Just from those excerpts alone (and many, many others just like it), anyone with half a brain can tell that I do not believe that an infringement of a copyrighted work is automatically not fair use simply because it uses my copyrighted content. His stubborn refusal to acknowledge this truth about my position, and his stubborn determination to continue to straw-man my position, constitutes actual malice: He either knows that his statement about me is false, or acts in reckless disregard to overwhelming evidence to the contrary.

69.      Even if, by some miracle, he manages to prevail on the issue of fair use, that still doesn't exonerate him of the libel here. Even if I ultimately am wrong about the limitations of fair use, that doesn't mean I felt that it wasn't fair use "simply because [he] used [my] content on [his] videos," yet the latter is what he accused me of believing. The latter is still demonstrably false (and therefore libelous) even if he ultimately does prevail on fair use.

70.      At this point, the only way he could possibly claim that he was telling the truth (or at the

very least, that he reasonably believed in good faith that he was telling the truth) is if he had some kind of objective evidence of pretext. That is to say, he has some empirical evidence that I don't actually believe any of the stuff I stated in ¶ 67 or that I will go on to discuss in Section IV-2 of this Complaint. Instead, I am lying about my belief in the validity of those factors as a pretext, and that, deep down inside, I really do believe that using my copyrighted content in any capacity is automatically a bar to fair use. But I highly doubt he can produce any real, objective, empirical evidence to that effect.

71.    Therefore, this statement not only constitutes libel per se (a false statement of fact that portrays me as being unfit for my chosen profession of making YouTube videos), but also misrepresentation under 17 USC § 512(f)(2), because it is a knowingly false statement that is material to the DMCA Takedowns I issued against him.

### III-4-B: My Demand for Retraction

72.    Later that night on January 3, 2024, I sent an email to Baz, explaining what I said above, demonstrating how his statement regarding my beliefs was libel, and demanding that he retract that statement about me.

73.    As of the time of this writing, I have not received any notice that he has retracted, or even attempted to retract, the libelous statement pursuant to this demand. Therefore, I am now eligible for general damages pursuant to the libel, including for emotional distress, loss of reputation, and punitive damages.

### III-4-C: Injuries I have suffered from the defamation

74.    In addition to statutory damages for the copyright infringement, I also seek to recover damages for emotional distress and loss of reputation caused by the libel.

75.    The libel which Baz published about me is not the only instance of this defamation that has occurred. It is only the most recent instance of a widespread series of accusations against me, of which Baz is only one of many participants. By participating in this smear campaign willingly, he has become jointly liable for the injuries I have suffered as a result of it, the same as any other co-conspirator. It's just the same as how the driver of a getaway car during a bank heist is just as liable for all crimes committed and all plaintiffs he injures as the people who personally took the

money out of the vault and/or fired any shots.

76.     Case 4:23-cv-00321-DMR (Stebbins v. Doe) is also a slander lawsuit, currently pending before this court, that documents all the harm I have suffered as a result of this widespread smear campaign. See Dkt. 1 (Complaint), ¶¶ 132-141 of that case for a description of the emotional distress, loss of reputation, and even life-threatening stress-related illnesses I have suffered as a result of the harassment and stochastic terrorism caused by that smear campaign. You can also see Case 4:22-cv-00546-JSW (Stebbins v. Rebolo), Dkt. 32, ¶¶ 53-140 for an abridged description of the harassment and stochastic terrorism I have been subjected to that lead to all this emotional distress and life-threatening stress-related illnesses.

77.     Now that Baz has willingly participated, not just in the copyright infringement, but also the defamation, he deserves to be jointly liable for all the harm this defamation has caused me, even if his own personal contributions may have amounted to an infinitesimal portion of the overall collective pot. It's just the same as how the driver of a getaway car during a bank heist is just as liable for all crimes committed and all plaintiffs who are injured as the people who personally took the money out of the vault and/or fired any shots.

### IV: LEGAL ARGUMENT

78.     The following laws are applicable to this case.

### IV-1: Prima Facie Copyright Infringement

79.     "There are only two elements necessary to the plaintiff's case in an infringement action: ownership of the copyright by the plaintiff and copying by the defendant." See Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F. 2d 1148, 1151 (9th Cir. 1986).

80.     Baz has undeniably copied from my Civility, Elden Ring, and Stormcloaks videos (which in turn means he also copied from my copyrighted songs). He also undeniably copied my icon at timestamp 25:55 of Civility Response Part 2. Therefore, for all thirteen counts of infringement, the second essential element of copyright infringement has been sufficiently plead.

81.     Meanwhile, the factual allegations in ¶¶ 7-23 sufficiently allege that I own the copyright in the works that I am suing over today.

### IV-2: Fair Use

82.     As I have been alluding to throughout this Complaint, fair use is most likely going to be the defendant's primary defense.

IV-2-A: Criticism & Commentary

83.     While it is true that Baz *occasionally* provided criticism of my videos, he only does so very sparingly. Even then, not all of his original commentary could truly be classified as "transformative." For example, in Stormcloaks Response Part 2, at timestamp 15:40, Baz merely exclaims in frustration, but fails to provide any actual commentary or criticism. Meanwhile, in that same video, at timestamp 18:52, he simply says "No it doesn't." These two clips do not meet the legal threshold to be considered "transformative." In order to be transformative, "[t]he use must be productive" and must aid "in the creation of new information, new aesthetics, new insights and understandings." See Seltzer v. Green Day, Inc., 725 F. 3d 1170, 1176 (9th Cir. 2013). From these two clips (and others like it), we gain no genuine insight or understanding of the original Stormcloaks video, other than the fact that he just doesn't like my video. At best, this should be considered the bare minimum amount of criticism.

84.     However, while other parts of his videos are a bit closer to being considered "transformative," it is important to realize that this is where his case for fair use begins and ends. Even if every other piece of criticism he provides fits the criteria to be considered "transformative" to a tee (which I dispute), the defendant's case for fair use must still fail because TDSOT has utterly failed to meet even a single other factor of fair use in his favor.

IV-2-B: Commercialization

85.     These two videos were commercialized. Even if Baz is not a member of the YouTube partner program (and even that has yet to be proven), YouTube itself is still profiting off of these videos being on its site. YouTube always puts ads on every video, even if the channel owner is not part of the YouTube Partner Program. See httpswww.searchenginejournal.com/youtube-is-showing-ads-on-non-monetized-channels/388674/ ("YouTube is running ads on non-monetized channels, but the creators aren't receiving a share of ad revenue").

86.     If prior communications are anything to go by, the defendant is sure to argue that the infringing videos should not be considered "commercialized" unless Baz himself is directly

profiting off of them. But that is not how the law works. In fact, it is literally the complete opposite. If anyone, at any point in the distribution of the infringing article, makes any money from its distribution, then the infringing article is commercialized, and everyone who is otherwise legally culpable for its distribution must acknowledge its commercial nature. See https://www.insidehighered.com/views/2011/08/02/myths-about-fair-use:

> **"Myth #3: Fair use is easy for an academic — I can take whatever I want because everything I do is noncommercial.**
>
> **Reality**: Working noncommercially does give you some privileges, but you'll be stuck in a gray zone if you depend on that to justify fair use. You won't be able to circulate your work in academic journals (they carry ads) or books (even nonprofit publishing houses sell their books). Even when you contribute for free to online sites, somebody's conducting commercial activity — perhaps an advertiser placing ads on a site, or a data miner."

87.     In other words, even if Baz did not personally see one cent of any of the revenue made from his response videos, they would still be considered "commercialized," simply because someone, somewhere, is making money off of them in some capacity.

88.     But even if the Court disagrees with me, and finds that Baz himself must have personally profited from the videos, the Court cannot make that factual finding on a § 1915 review or on a Rule 12(b) Motion to Dismiss. At the pleading stage, the Court must accept all facts in the complaint as true and in a light most favorable to the Plaintiff. This means that, for the purposes of the Complaint, the Court must assume that the video is being commercialized by Baz in some capacity, and then work from there. Then, Baz will have to testify to what extent he is, directly or indirectly, profiting off the infringing videos, or whether he even has any hopes of ever profiting off of them in the future. But that is a bridge the Court and I will have to cross when we come to it.

### IV-3-C: Factor #2: Nature of the Copyrighted Work

89.     First, as I mentioned earlier, all of the copyrighted works that I am suing over today are all unpublished. See Section III-1-F above. This automatically means that the second factor of fair use must weigh against the defendant, regardless of the level of creativity in the original work. See Monge v. Maya Magazines, Inc., 688 F. 3d 1164, 1177-78 (9th Cir. 2012) (holding that

the "unpublished" sub-factor outweighs the "nonfiction" sub-factor).

90.     However, even if the Court disagrees with my interpretation of Circular 66 and insists that the songs are all published, the second factor must still weigh against fair use because these works are all highly creative. Music is inherently creative, and since the ten songs are what I have a copyright registration over and what I am officially suing over (at least in regards to Infringements #4 - #13), that is the element of the Stormcloaks video that should be considered when discussing the second factor of fair use.

91.     But even barring that, even the elements that are entirely unique to the Stormcloaks video are still highly creative. For example, at timestamp 3:09 – 3:36 of the Stormcloaks video (which was included in Part 1 of Baz's infringing series, at timestamp 8:03 – 8:08, without him even commenting on or criticizing it), you can see me making a statement that is, indeed, extremely expressive. Similarly expressive statements can be found all throughout the Stormcloaks video, including at timestamps 43:46 – 43:53, 1:39:45 – 1:40:06, 2:02:04 – 2:02:32, and 2:21:19 – 2:21:32, just to name a few.

92.     Of course, I am not currently suing over the Stormcloaks video itself, but if TDSOT can get fair use over the Stormcloaks video, he also has fair use over the ten background songs, so it is still worth addressing.

93.     Even the Civility and Elden Ring videos qualify as "highly creative" in this regard, even if they weren't unpublished. Those two videos are dominated by my opinions, not statements of cast-iron objective fact. Therefore, the second factor should weigh against fair use. See Cambridge University Press v. Patton, 769 F. 3d 1232, 1270 (11th Cir. 2014):

> "[W]e find that the District Court erred in holding that the second factor favored fair use … Where the excerpts of Plaintiffs' works contained evaluative, analytical, or subjectively descriptive material … or derives from the author's experiences or opinions, the District Court should have held that the second factor … weighed against fair use in cases of excerpts that were dominated by such material."

94.     The same is also true about the Stormcloaks video: Dominated by opinions and evaluative, analytical, and subjectively-descriptive material.

95.     Therefore, whether the works are unpublished or whether the works are highly creative,

the second factor weighs heavily against fair use.

### IV-3-D: Factor #3: Amount & Substantiality of Portion Taken

96.    In all instances that I am suing over in this case, Baz copied 100% of the original videos, literally every single last second of them. This is an egregious violation of the third factor of fair use. In fact, it used to be the precedent in the 9th Circuit that, whenever a secondary user copied the entirety of the original work, that precluded fair use in its entirety. See Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F. 2d 1148, 1155 (9th Cir. 1986).

97.    Although that is no longer the case, the 9th Circuit has nonetheless held that using the entirety of the original work still means that the third factor weighs against fair use as a matter of course, without the district courts being afforded any discretion in this regard. See Worldwide Church of God v. Philadelphia Church of God, Inc., 227 F. 3d 1110, 1118 (9th Cir. 2000) (citing Hustler, supra at 1155). While it is theoretically possible to still get fair use overall while copying 100% of the original work, the district court must still find the third factor to weigh against fair use as a matter of binding precedent.

### IV-3-E: Effect on the Market

98.    "This last factor is undoubtedly the single most important element of fair use." See De Fontbrune v. Wofsy, 39 F. 4th 1214, 1226 (9th Cir. 2022) (citing Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 US 539 (1985)). Moreover, it is the one factor that has been expressly affirmed by the Supreme Court as being singularly capable of negating fair use in its entirety, all on its own. "[T]o negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the potential market for the copyrighted work." See Monge, supra at 1182 (emphasis in original). "If the defendant's work adversely affects the value of any of the rights in the copyrighted work … the use is not fair." Harper & Row at 568.

99.    It is also important to note that the defendant necessarily holds the burden of proof on this issue. See Dr. Seuss v. Comicmix, 983 F. 3d 443 (9th Cir. 2020), which unequivocally calls upon the defendant, "as the proponent of the affirmative defense of fair use," to "bring forward favorable evidence about relevant markets," and stating that this is one of the few "absolute statements" when it comes to fair use. See id at 458-60.

100.    I am not required to allege market harm in the Complaint. See Peterman v. Republican National Committee, 320 F. Supp. 3d 1151, 1157 (MT 2018) ("[I]t is not necessary to plead facts that disprove fair use to survive a Rule 12(b)(6) motion to dismiss"). The fact that I am offering to make a token argument here is a courtesy, not a requirement.

101.    That being said, Baz has copied the entirety of my Civility and Elden Ring videos, and he has made it clear that he plans to cover the entirety of my Stormcloaks video in his current format (where he plays long stretches of the video and only occasionally intersperses them with brief excerpts of criticism) if given the chance to. He was not allowed to finish the series before his channel was taken down, but he has made it clear that this is his intention if his channel is ever reinstated. If he is allowed to complete this series under this format, he will have copied literally 100% of the Stormcloaks video, literally every single last second of it.

102.    This constitutes a market substitute, per se.

(a)    See also Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F. 2d 1148, 1154 (9th Cir. 1986)

"[B]y copying all or substantially all of the copyrighted work, the distinction of function vanishes since whatever the intent of the copier, a verbatim reproduction will of necessity serve the function of the plaintiff's work as well as that of the defendant's."

(b)    See also Cambridge University Press v. Patton, 769 F. 3d 1232, 1271 (11th Cir. 2014)

"A book reviewer who copies snippets of a book is likely to increase the demand for the book, but were a book reviewer to quote the entire book in his review … he would be cutting into the publisher's market, and the defense of fair use would fail."

(c)    See also Consumers Union of US v. General Signal Corp., 724 F. 2d 1044, 1051 (2nd 1983)

"The fourth fair use factor will come into play if too much is copied or if the entire plot is revealed, thereby usurping the demand for the original work."

(d)    See also https://youtu.be/1Jwo5qc78QU?t=1158 (timestamp 19:18 - 20:22)

"Mystery Science Theater was ... absolutely transformative, but they still licensed the movies ... because yeah, playing someone else's entire movie, just with

wisecracks over it? Probably not fair use!"

(e)  See www.youtube.com/clip/UgkxDPeQBnbcZAewwjxh7tHyYQPpeMkYUrNS

"by showing those clips in full to the audience ... it's entirely possible that you
might not watch the [original] videos because you saw, basically, the whole thing
in [the defendant]'s videos."

(f)  www.youtube.com/clip/Ugkxp9Ev6N8qsYViDPqkrtAuE8nZZWpq8oD7

"if it completely displaces the market for the original, it's probably not fair use,
and it's pretty obvious that, once you see a video during a [response to it] ... you're
not gonna go back and watch the whole video again."

(g)   See also www.youtube.com/clip/Ugkxznh99XHVyjyPhyQKWiWE_n8XASNgbpxW

"Honestly, were it not public domain, I don't think it would meet the
transformative requirements for fair use parody protection. Large parts of the
original text are copy-pasted pretty much verbatim, punctuated only occasionally
with Arabella's cynical or horrified thoughts on the matter ... this isn't really Matt
Youngmark's book; it's Frank L. Balm's book with sarcastic commentary penciled
into the margins."

103.    Therefore, if the Defendant wishes to argue fair use, he has some heavy lifting to do
when it comes to proving a lack of market substitute.

IV-3-E: Fair Use in Conclusion

104.    In conclusion, we have three of the four factors weighing definitively against fair use,
with one factor (the first factor) being an extremely borderline case, given how few and far
between the criticism actually is, and how undeniably commercial the site on which it is hosted
is. See Monge v. Maya Magazines, Inc., 688 F. 3d 1164, 1177 (9th Cir. 2012) ("[The
Defendant's] minimal transformation of the [original work] is substantially undercut by its
undisputed commercial use. On balance, the first factor is at best neutral, and does not support
[the Defendant]'s claim of fair use") (citations omitted).

105.    With 3½ factors weighing against Baz as a matter of course, that leaves criticism as his
last bastion of hope for obtaining fair use. However, with 3½ factors weighing against him right
out of the gate, then unless the criticism he provides is ***absolute gold*** – not just giving dissenting
opinions, but extremely insightful, downright philosophical commentary, the kind that Confucius

himself would tip his hat to – then his case for fair use is effectively dead on arrival.

106.    The defendant had a case for fair use practically gift-wrapped for him. All he had to do was remove all the parts of my videos he didn't need in order to make his criticism. If he had just done that, he would have had a much stronger case. But he felt that was beneath him.

107.    Contrary to common misconception, the addition of a nonzero amount of criticism, no matter how few and far between, does not automatically guarantee that your video is fair use, to the exclusion of all other factors. This is the misconception that Baz and many other YouTubers just like him fall victim to, but that is not actually how the law works. See See Dr. Seuss Enterprises, LP v. COMICMIX LLC, 983 F. 3d 443, 452 (9th Cir. 2020) (citing Monge at 1173) ("While the analysis of … fair use … may be guided by the examples given in the preamble to § 107, i.e., criticism, comment, news reporting, teaching, scholarship, and research, not even these works compel a per se finding of fair use") (citations and quotations omitted).

108.    Therefore, the claim for fair use which the Defendant is sure to attempt to raise in this case must fail.

### IV-3: Libel

109.    The tort of libel involves (a) a publication that is (b) false, (c) defamatory, (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage. See Taus v. Loftus, 54 Cal.Rptr.3d 775, 804 (2007).

110.    The statement referenced in ¶ 62 was submitted to YouTube's copyright enforcement department. This counts as "publication" because it was communicated to at least one third party.

111.    To be false, it must first be a statement of fact, or at least mixed fact and opinion. Fortunately, the allegations of ¶ 63 above sufficiently establish Baz's statement as one of fact.

112.    As for being false, the allegations of ¶¶ 65-68 above (and especially ¶ 67 and its corresponding sub-paragraphs) sufficiently plead facts which prove the statement to be false.

113.    The third element – defamatory – only means it is "injurious to reputation." See https://www.dictionary.com/browse/defamatory. Baz's statement about me clearly meets this requirement. By accusing me of holding this highly delusional belief about how fair use works, he is attempting to portray me as completely delusional and entirely disconnected from reality.

114.    Unprivileged just means that it wasn't stated in any capacity where a speaker has the absolute privilege to publish defamatory material, such as during a Congressional floor debate or during litigation. This is obviously not present here.

115.    As I explain in Section III-4-C of this Complaint, as well as the thereby incorporated paragraphs of other filings, the smear campaign (of which Baz is now a willing participat) has resulted in thousands of people harassing me, to the point of me suffering life-threatening pneumonia due to the stress and anxiety. As a result, this defamation absolutely qualifies as having a natural tendency to injure.

116.    Therefore, Baz's statement about me mentioned in ¶ 62 of this Complaint meets all the requirements to be actionable libel.

### IV-4: DMCA Misrepresentation

117.    The same statement which constitutes libel also constitutes DMCA misrepresentation under 17 USC § 512(f)(2). In order to violate that statute, a DMCA Counter-Notification must make a representation to the ISP (in this case, YouTube) that is (A) material to the Counter-Notification and/or its corresponding DMCA Takedown, (B) false, and (C) the defendant either knew it was false or acted with reckless disregard to its falsity, similar to the threshold for defamation of a public figure as set forth in New York Times Co. v. Sullivan, 376 U.S. 254 (1964).

118.    The statement mentioned in ¶ 62 undoubtedly counts as a "representation." It is also false for reasons I have already stated when discussing the law of libel. It is undoubtedly "material" to the DMCA Counter-Notification because it heavily implies that my DMCA Takedown was bordering on violating 17 USC § 512(f)(1) in its own right.

119.    A statement does not have to be singularly dispositive of the DMCA Takedown (such as a total failure to consider fair use in any capacity) in order to be considered "material." As my state's Supreme Court frequently finds, "evidence need not conclusively prove the ultimate fact in issue ... To be relevant evidence it need only be a brick, not a wall." See Walker v. State, 783 SW 2d 44, 46 (1990)[5] (citations and quotations omitted).

120.    The factual allegations contained in ¶¶ 65-68 (and especially ¶ 67 and its corresponding

---

5   https://scholar.google.com/scholar_case?case=13786370352728227242

sub-paragraphs) sufficiently establish that the Defendant either knew this statement was most likely false or actively buried his head in the sand regarding evidence that it was false.

121.    Therefore, I have sufficiently plead DMCA Misrepresentation.

### V: RELIEF REQUESTED

122.    For the 13 counts of copyright infringement, I request the following relief:

### V-1: Statutory Damages for copyright infringement

123.    First, I request statutory damages of $150,000 for each of the ten different copyrighted works that were infringed. Because there were thirteen (13) counts of infringement, this comes out to a total of $1,950,000 in statutory damages.

124.    I am eligible for statutory damages for all thirteen counts of infringement under 17 USC § 412(2). The ten copyrighted songs were all registered on March 5, 2023, which predates Baz's infringement of them, so I am eligible for statutory damages there.

125.    For the Civility video, Elden Ring video, and Icon #6, it's a little more complicated. In those instances, the must remember that all of these works are, at least officially, unpublished, for reasons I explain in Section III-1-F of this Complaint. For this reason, I can apply for registration of those works *whenever I want*, and I would still be eligible for statutory damages. After all, any registration date is necessarily "within three months after the first publication[6]" if *there is no first publication*!

126.    Therefore, I am eligible for statutory damages for all thirteen counts of infringement.

### V-2: Damages for libel and DMCA Misrepresentation

127.    For the libel and DMCA misrepresentation, I ask for damages for emotional distress and loss of reputation in the amount of $1,000,000 US dollars. This is the same that I am requesting from SidAlpha in Case 4:23-cv-00321-DMR. As I explain in the Complaint in that case, the dollar amount is based roughly on what the cost of my hospitalization and surgery would have been if I were not insured, and so is used as an approximation of the value of emotional distress, loss of reputation, and pain and suffering that I have suffered as a result of all of the harassment and stochastic terrorism that the smear campaign (of which Baz is now a willing participant) inflicted upon me.

---

6   17 USC § 412(2)

128.    I also ask that the Court award me an amount of punitive damages, up to ten times the aforementioned compensatory damages, to sufficiently deter the defendant and others like him from participating in this smear campaign in the future.

### V-3: Injunctive Relief for Copyright Infringement

129.    For all counts of copyright infringement, I ask for the following injunctive reliefs:

130.    First, I ask that he be made to remove all instances of my copyrighted content from all of his social media accounts in their entirety, pursuant to 17 USC § 502.

131.    Second, I ask that he be made to hand over all of his computers, smartphones, and other devices on which my copyrighted content may potentially be stored, and that they be impounded and purged of all instances of my copyrighted content, pursuant to 17 USC § 503.

132.    I ask that the Defendant be made to pay, in the first instance, all costs associated with compliance with these injunctions.

### V-4: Injunctive Relief for Libel and DMCA Misrepresentation

133.    In response to his libel and DMCA misrepresentation, I ask that he be ordered to publicly correct the statements he made about me in such a way that ensures that my reputation is fully restored. He should not be required simply to tell everyone that he was wrong, but to *actually convince* them, to the point where literally everyone on Earth, with no exceptions, has either never heard of this controversy in the first place, or their must *subjectively believe* that I am the blameless victim of copyright infringement that is not fair use (and that Baz willingly and maliciously participated in same), and absolutely nothing else.

134.    That sounds impossible, but it really is not. Such feats have been accomplished in the past. One of the most famous examples of this happening is the plaintiff in the case of Liebeck v. McDonald's Restaurants, also known as the "McDonald's coffee case." For several years after that case concluded, Ms. Liebeck was branded as a greedy vexatious litigant (much like what Baz and his allies are attempting to do to me), but now, in the 2020s, it is virtually unheard of to find a person who still genuinely believes that. Nowadays, the efforts to correct the story have been so successful and so thorough that the only time you ever hear the original story is when the person telling it is specifically setting up to explain how that misconception has been thoroughly

disproven.

135.    So that alone proves that it is not impossible to fully restore my reputation. It may be difficult, and it may be expensive, but that alone has never stopped a court from issuing an injunction that substantial justice otherwise requires.

136.    In practice, this would mean that Baz would be held in contempt of court (including invoking the USA's extradition treaty with Brazil to have him forcibly brought to the United States to spend time in coercive confinement) if anyone ever accuses me, openly or behind closed doors, of believing that a copyright infringement is automatically not fair use "simply because [he] used [my] content on [his] videos," or some reasonably similar variation thereof. After all, if someone continues to make that accusation against me, that is clearly evidence that Baz has failed in his injunction to convince everyone that this is not true, isn't it?

### V-5: Other Relief

137.    I also ask for costs incurred to be reimbursed (including the fees needed to register the copyrights for all of these works), and also for any other relief that the Court believes I may be entitled to.

### VI: CONCLUSION

138.    Wherefore, premises considered, I respectfully pray that judgment in my favor be granted, costs incurred be awarded and for any other relief to which I may be entitled.

        So requested on this, the 8th day of January, 2024.

                                                    David Stebbins (pro se)