David Stebbins (pro se Plaintiff)    123 W. Ridge Ave., APT D, Harrison, AR 72601
(870) 212-4947                       acerthorn@yahoo.com

### UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

DAVID STEBBINS,                                          PLAINTIFF

VS.                        _____

THIAGO CHAGAS GARCIA BAZ                                 DEFENDANT

### COMPLAINT

Comes now, *pro se* Plaintiff David Stebbins, who hereby submits the following Complaint against defendant Thiago Chagas Garcia Baz for twenty-one (21) complaints of copyright infringement, one (1) count of libel, and one (1) count of DMCA Misrepresentation in violation of 17 USC § 512(f)(2).

### I: PARTIES TO THE CASE

1.      I am a Youtuber and Twitch streamer who goes by the alias "Acerthorn." My Youtube channel can be found at the url of www.youtube.com/@acerthorn, and my Twitch channel can be found at the url of www.twitch.tv/acerthorn.

2.      The Defendant used to have a YouTube channel of his own before it was terminated after he received four different copyright strikes from me. This channel went by the name "Templar Dragonknight, Son of Thudner." He is a resident of Brazil. According to his DMCA Counter-Notification, he can be served with process at the following address:

> Guairá street #51
> Apartment 112
> São Paulo, SP
> Brazil

### II: JURISDICTION AND VENUE

3.      This Court has subject-matter jurisdiction over this case because, as a case for copyright infringement, it has federal question jurisdiction.

4.      Venue and personal jurisdiction is proper in this court pursuant to the statute of 17 USC § 512(g)(3)(D).

(a)     The defendant is a foreign national. Specifically, he is a resident (and presumably citizen) of Brazil.

(b)     When he issued his DMCA Counter-Notification, he checked a box that said "I consent to the jurisdiction of the Federal District Court for the district … if my address is outside of the United States, the judicial district in which YouTube is located, and will accept service of process from the claimant." This consent was required in order for the counter-notification to be legally valid, under § 512(g)(3)(D).

(c)     YouTube is headquartered in San Bruno, CA, which is part of the Northern District of California. Therefore, this court has personal jurisdiction over this case.

### III: FACTS OF THE CASE

5.     The following facts are necessary to understand this case.

### III-1: The Copyrighted Works

6.     I own the following copyrights, which are relevant to this action:

#### III-1-A: Acerthorn Channel Icon #6

7.     On or around May 31, 2019, I created a 2D image that I would then proceed to use as my channel icon for several years. I dubbed this image "Acerthorn Channel Icon #6," and registered the copyright under that name. The registration number for this copyright is VA0002294009.

#### III-1-B: First Racist Video

8.     On June 8, 2018, I posted a video to my YouTube channel called "Are the Stormcloaks racist? - Elder Scrolls Discussion & Lore Episode 1." This video was later replaced by the "Stormcloaks video" mentioned above. For simplicity's sake, I will refer to this video as the "First Racist video" for the rest of this Complaint. The video can be found at the following URL: https://www.youtube.com/watch?v=RH-J0sDaso4

9.     The copyright for this video is registered with the Copyright Office under the registration number PAu004209058.

#### III-1-C: First Stormcloaks Videos

10.     On January 12, 2020, I posted a video to my YouTube channel called "Why You Should Side With the Stormcloaks - Elder Scrolls Lore Discussion." For simplicity's sake, I will refer to

this video as the "First Stormcloaks Video." Along with the First Racist video, this video was later replaced by the "Second Stormcloaks video" mentioned later in this Complaint.

11.     This video was dedicated to discussing the lore and story of a video game called "The Elder Scrolls V: Skyrim." Specifically, it discussed the civil war that happens during that game whereby an army of rebels known as the Stormcloaks are attempting to overthrow the existing Empire. As the title of this video suggests, I side with the Stormcloaks while playing this game, and in this video, I argue my case for why people should do the same.

12.     The video can be found at the following URL: https://www.youtube.com/watch?v=XwLNXHMhyBA

13.     The copyright for this video is registered with the Copyright Office under the registration number PAu004209058.

### III-1-D: Ducking Video

14.     On May 16, 2022, I posted a video to my YouTube channel called "Maybe YOU'RE the ones ducking ME!" For simplicity's sake, I will refer to it as "the Ducking video" for the rest of this complaint. The video can be found at the following URL: https://www.youtube.com/watch?v=5bxs8fq9rl8

15.     The copyright for this video is registered under the registration number PAu004190174.

### III-1-E: Aaron Video

16.     On May 17, 2022, I posted a video to my YouTube channel called "Aaron Admits Atrocious Actions are Caused by Creation of Critical Content." For simplicity's sake, I will refer to it as "the Aaron video" for the rest of this complaint. The video can be found at the following URL: https://www.youtube.com/watch?v=OF26dyzWvxI

17.     The copyright for this video is registered under the registration number PAu004213836.

### III-1-F: Retorting Against Mean Comments

18.     On July 28, 2019, I posted a video that ended up being the first video in a series. This series was called "Retorting Against Mean Comments." The link to the playlist can be found at the following URL: https://www.youtube.com/playlist?list=PLpL3n7W6QqgCZyss8vCmgo6Y_9I0odd5k

19.     The first nine episodes are all registered with the copyright office (with Episode 10 onwards containing my copyrighted music in the background). The registration number for these nine videos is PAu004213836.

20.     Of the videos in this playlist, four of them were infringed upon by Baz and therefore are relevant to this action. The following chart shows their full names, the "simplified" names I have given them for the sake of this complaint, their original posting dates, as well as their individual URLs:

| Full Name | Shortened Name | Original Upload Date | URL |
|---|---|---|---|
| Retorting Against Mean Comments - "Rumor Has It" #Shorts | Incest Video | 04/12/21 | https://youtube.com/shorts/nX2gUQkPrZ8 |
| Retorting Against Mean Comments #05 - Everything is Wrong - #Shorts | Fractions Video | 08/16/21 | https://youtube.com/shorts/7LCzDlAT-s8 |
| Retorting Against Mean Comments #06 - Childhood Trauma Resurfaces - #Shorts | Trauma Video | 08/18/21 | https://youtube.com/shorts/ELIRsbqH38k |
| Nirgorilla Returns … and Is A Total Hypocrite - Retorting Against Mean Comments Pt. 7 - #Shorts | Nirvgorilla Video | 03/06/22 | https://youtube.com/shorts/xlLDUQ11ne0 |

III-1-G: Civility Video

21.     On October 17, 2020, I published a video to my YouTube channel called "Why I Demand Civility in the Comments of my Videos." For simplicity's sake, I will refer to it as "the Civility video" for the rest of this Complaint. The video can be found at the following url:
https://www.youtube.com/watch?v=Pynxo57AB5s

22.     This video was created by me, and so contains human authorship. It has minimum creative spark because it contains multiple opinions of mine, as well as explanations as to why I hold the opinions I hold. The Court need only watch the video itself to see for itself that the way I express my opinions in this video constitutes minimum creative spark.

23.     The copyright for this video is registered with the Copyright Office. The registration number is **Pau004209058.**

### III-1-H: Elden Ring Video

24.     On March 23, 2022, I posted a video to my YouTube channel called "Elden Ring Sucks, and Here's Why." For simplicity's sake, I will refer to it as "The Elden Ring video" for the rest of this Complaint. The video can be found at the following url: https://www.youtube.com/watch?v=m0iT_TFcaFE

25.     Like the Civility video before it, this video contains minimum creative spark because I fill the video with opinions of mine, as well as explanations as to why I hold the opinions I hold. Just like with the civility video, I feel the Court need only watch the video itself to see for itself that the way I express my opinions in this video constitutes minimum creative spark.

26.     The copyright for this video is registered with the Copyright Office. The registration number is **PAu004190174.**

### III-1-I: Ten Copyrighted Songs

27.     In February of 2023, I contracted with a composer in Argentina by the name of Augustin Navarro to compose ten original songs for my channel.

28.     The titles for these ten songs are as follows:

    (a)     Acer's High

    (b)     Long Prat Fall

    (c)     Sigh of Relief

    (d)     Section of Life

    (e)     Sample of Life

    (f)     Epic Moment

    (g)     Blinding Rage

(h)      There Is No Hope

(i)      Smile on My Face

(j)      Ready for Action

29.      You can listen to these songs by going to the following unlisted playlist on YouTube: https://www.youtube.com/playlist?list=PLpL3n7W6QqgBB_ZRVducMkGN3CRaz3isQ However, you will have to pay my channel at least $1 per month to be able to listen to these songs. Maybe, once this case gets underway, I can file under seal so the Court can hear these songs for free without me giving away free samples to the public.

30.      These were works for hire, which means that I own 100% of the copyright to these songs, and he only received a flat fee for his labor.

31.      These songs are legally eligible to be works for hire because they were intended to be used as background music for my YouTube channel. Therefore, they qualify as "supplementary works," specifically they were composed "as a part of a motion picture or other audiovisual work," thereby meeting the legal definition to be a work for hire under 17 USC § 101.

32.      Barring that, Navarro and I signed a contract, written by an American attorney at our behest, stating that, even if these songs are not legally eligible to be works for hire, he was still *selling* the copyrights to me. When I showed this contract to Identifyy[1], they accepted this contract as proof that I was indeed the sole copyright owner (although my attempts to do business with them fell through the cracks for other reasons), so I am confident this Court will accept this contract as proof that I am copyright holder, once I disclose it in discovery.

33.      In any event, I registered the copyright for these ten songs before I began using them in any of my videos. The registration number for these ten songs is Sru001538491. The effective date of registration is March 5, 2023.

34.      Although I have registrations for these ten songs, and these songs will invariably be included in all of my YouTube videos going forward (meaning anyone who copies any portions of my videos will, almost invariably, be copying portions of these songs as well), it is not necessary for a secondary user to criticize these songs, specifically, in order to be eligible for the

---

1    Identifyy – spelled with two Y's at the end – is an online company that assists musical artists in registering their songs for YouTube's "Content ID" system, so they can place copyright claims on videos which use those songs.

"fair use" defense. My *registration* of these ten tracks can be used as a work-around to keep me from expensively having to *register* each individual video every time it gets infringed upon, but it is not a work-around that gets around fair use law. As long as a secondary user makes a fair use of whatever videos contain these songs, their use of the music itself should also be classified as fair use.

35.      However, that still requires they actually ***make fair use*** of the videos, and as this Court is surely aware (and which many people on the Internet frequently get wrong), fair use requires more than just providing criticism. Criticism is certainly a good first step to fair use, but it's only one factor.

<u>III-1-J: Second Stormcloaks Video</u>

36.      On March 25, 2023, I published a video on my channel called "You Should Side with the Stormcloaks, and Here's Why." For simplicity's sake, I will refer to it as "the Stormcloaks video" for the rest of this complaint. You can see this video at the following url:

https://www.youtube.com/watch?v=skZOI4lDKhI

37.      Like the First Stormcloaks Video, this video was dedicated to discussing the lore and story of a video game called "The Elder Scrolls V: Skyrim," and why people should side with the Stormcloaks in that game.

38.      Throughout this video, I use all ten of my copyrighted songs as background music. I begin with "Long Pratt Fall" in the first 14 seconds, then switch to "Acer's High" for timestamps 0:14 – 1:33, then to "Smile on my Face" during timestamps 1:34 – 5:07, and so on. This means that anyone who copies 100% of the March 25 video also necessarily infringes on *ten different copyrights*, not just one. Now again, just like I said earlier, this doesn't matter if the secondary use is a fair use, but again, fair use requires more than *just* criticism alone.

<u>III-1-K: The songs, the icon, and all videos, are all unpublished.</u>

39.      It is also worth noting that all ten songs, the icon, as well as all the videos, all fit the legal definition of "unpublished." This is because they were only ever published on YouTube. A work is not considered "published" simply because it is posted online. This is established by "Circular 66," which is published by the US Copyright Office and is entitled to deference pursuant to

Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). You can find that document here: https://www.copyright.gov/circs/circ66.pdf

40.     On pages 4-5 of that circular, it says in pertinent part …

"The fact that a work has been placed online or posted on a website does not necessarily mean that the work has been published. The Office considers a work published when copies of it are distributed to the public by sale or other transfer of ownership if the copyright owner authorizes the end user to retain copies of the work. *Merely displaying or performing a work online generally does not constitute publication.* … *Just because an end user can technically reproduce a work does not necessarily mean that the work has been published.* A copyright owner must have expressly or implicitly authorized users to make *retainable copies* of a work by downloading, printing, or other means for the work to be considered published.

The concepts of authorization and publication can be complicated and may have serious consequences for the author or copyright owner. For this reason, *the Office generally lets the applicant decide whether a particular work is published or unpublished.* In making this determination, you may wish to consider the following general guidelines.

• Work made available only by streaming. *Streaming is a performance*, which, in and of itself, *does not constitute publication*, because, as a practical matter, the end user does not retain a copy of the work when the performance ends.

• Work for which downloading or reproduction is expressly prohibited. *If there is a notice on a website in the terms of service for the site or another obvious place indicating that a work or the content on the site cannot be downloaded, printed, or copied, the work or content may be deemed unpublished*, because the end user is not authorized to download, print, or otherwise distribute copies.

…

• Work made available through an implied license. *It may be unclear* whether the copyright owner authorized the public to retain copies of the work if a work is posted on a website and there is no evident statement in the terms of service for the site—on the web page where the work is displayed or elsewhere—stating that the work can be downloaded, copied, forwarded, shared, or printed."

41.     Important sections of that excerpt were bolded and italicized for emphasis.

42.     Applying these rules to the instant case, none of the copyrighted works in question here

qualify as "published." They are merely "performed" on my YouTube channel, not licsensed or sold. There was no option to download these works for offline viewing, except by third party means. YouTube expressly forbids downloading any videos off of their site except through the methods they themselves provide[2], nor have I hosted any of these songs, or March 25 video, on any other services besides Twitch or YouTube, so there is no way I posted it to any website which explicitly authorizes third party downloading.

43.    However, even if my understanding of the facts is wrong, it ultimately doesn't matter. Bear in mind that Circular 66 says that, sometimes, it may be "unclear" whether this counts as a "publication." Earlier in that excerpt, they also stated that, whenever it is ambiguous, ***the copyright owner gets to decide*** whether it is published or unpublished! This means that the burden falls to the defendant to prove, not just that I am wrong about this, but that I am objectively unreasonable in forming my belief. If there is any ambiguity in the facts, my preference is entitled deference. Therefore, the songs and videos are still legally classified as "unpublished" and there's no two ways about it.

### III-2: Infringements by Defendant

44.    Defendant Baz has made numerous videos responding to my videos, claiming to be "debunking" them. I disagree with his reasoning, but that is not the point of this lawsuit. The point is that he used my copyrighted content in a way that is not fair use. He, along with countless other YouTubers, have this delusional belief that, as long as they provide a token amount of criticism of someone's video, there is a 100% chance that their response videos are fair use, no ifs ands or buts, and therefore they are entitled to copy literally 100% of the original video and completely displace the market for the original. Baz is one such delusional individual, and his infringements of the three videos mentioned above3, and for the reasons set forth below, none of them qualify as fair use.

45.    With one exception, all of the defendant's response videos that I am suing over today

---

2    See https://www.youtube.com/t/terms:

   "The following restrictions apply to your use of the Service. You are not allowed to:
   1. access, reproduce, download, distribute, transmit, broadcast, display, sell, license, alter, modify or otherwise use any part of the Service or any Content except: (a) as expressly authorized by the Service; or (b) with prior written permission from YouTube and, if applicable, the respective rights holders"

have been taken off the defendant's YouTube channel. Some of them were removed by me issuing DMCA Takedowns against them, whereas others were deleted by Baz of his own accord after his channel was interimly unbanned[3] to prevent me from issuing DMCA Takedowns against them. One of them - Part 1 of his trilogy of " First Racist Response" videos - still remains publicly visible on his channel as of the time of this writing.

46.    With one exception, all of the defendant's response videos that I am suing over today were able to be backed up by me before they were taken down. For the one that I was not able to back up, we can still subpoena the video from YouTube if we need to, once the case moves to discovery. I have submitted a formal request to YouTube's Legal Department's email address, asking them to preserve all of this data for me, and I used the webpage of www.findlaw.com/legal/technology/ediscovery-guide/preservation-legal-requirements.html as a guide for how to format that request, so I am hopeful that they will still have the information when we subpoena it from them.

47.    For the videos I was able to back up, I have uploaded them as unlisted to my own YouTube channel, and all of them (except the one I wasn't able to back up) can be viewed by going to the following unlisted playlist: https://www.youtube.com/playlist?list=PLpL3n7W6QqgC0PoRtN7Tl53LJ8ilctl3A.

48.    All the videos in this playlist are unlisted (meaning they are not automatically distributed by the YouTube algorithm outside my direct control), monetization has been voluntarily disabled for each of them, and I will not distribute them outside of what is necesssary for this case. For this reason, I believe I am entitled to an exception to Baz's copyright of these videos, because I am making and using these copies exclusively as evidence in court, which is a well-established exception to copryight law.

49.    In addition to these videos themselves, if you look in the descriptions of each of them, you will find a link to a "playlist of clips." This playlist takes the corresponding videos and chops

---

3   Once I filed the original Complaint in this case, YouTube agreed not to reinstate the four videos that Baz had countered. However, the copyright strikes associated with those four videos were interimly removed, with the promise that they would be reinstated if I prevailed on the merits in the underlying copyright infringement claims. For the time being, however, the interim removal of those strikes meant that his YouTube channel was likewise unbanned in the interim.

them up into clips, with each clip being exclusively one of two things: Either he is copying my videos or he is providing his own original narration. He never does both at the same time; whenever he gives criticism, he always pauses my video to do so.

50.     In most of the playlist of clips, the odd-numbered clips consist of Baz giving original narration, while the even-numbered clips are the sections of his response videos where he copies my videos. For the "First Racist Response" videos, there is no "Clip 01." I began each of those three playlists with "Clip 02" because this is the only trilogy of videos where he started his response by playing a portion of my video. So for those three playlists, I skipped over Clip 01.

51.     These playlists of clips of are designed to make it easier for the Court to see, with its own two eyes, that I am not lying or exaggerating when I make the upcoming outlandish claims about exactly what Baz did that makes his case for fair use so laughably weak. The claims I am about to make are extraordinary, and portray Baz as being a world class idiot for having the audacity to claim this is actually fair use, and as the old saying goes, "extraordinary claims require extraordinary proof." So the playlist of clips makes it easier for the Court to see the stupidity with its own two eyes.

52.     With that said, let's finally discuss the infringements.

III-2-A: Infringement #1: First Racist Response

53.     On March 4, March 31, and April 20, 2019, Baz uploaded a trilogy of his videos to his YouTube channel that all contained the words "Acerthorn's 'Are the Stormcloaks Racist' DEBUNKED" in the title, followed by the phrase "Part 1/2/3" (respectively), and a subtitle following that. To this date, Part 1 of that trilogy is still up, although he has removed Parts 2 and 3 of his own accord. The trilogy, if it were still up, could be viewed at the following URLs:

(a)     Part 1: https://www.youtube.com/watch?v=YXV2sbNY2-Q

(b)     Part 2: https://www.youtube.com/watch?v=tRPds42cu10

(c)     Part 3: https://www.youtube.com/watch?v=tE7c6qvyHRA

54.     As the titles would suggest, this trilogy was meant to be a response to the First Racist Video. Therefore, for simplicity's sake, I will refer to these videos as the "First Racist Response," Parts 1/2/3 respectively.

55.     Although Part 1 only uses two brief clips of my First Racist Video (and therefore would have a nonfrivolous case for fair use if we were to only consider that one video in isolation), the entire trilogy of videos used the entirety of my First Racist Video, literally every single last second of it, except for the outro segment where I said nothing substantial (timestamp 27:17 - 27:49 of the First Racist Video), so there was nothing to copy anyway. During Parts 2 and 3, Baz would play long stretches of my video without interruption or alteration. For example, in Part 3 of the First Racist Response, at timestamps 1:50 - 4:14 (Clip 04 of the playlist of clips), Baz played a 2 minute and 24 second stretch of the First Racist Video before finally stopping to give criticism.

56.     On a related note, it is exceptionally telling that Part 1 of this trilogy is the one video that Baz chose not to delete. It is obvious that the reason he deleted all his other videos about me after his channel was interimly unbanned was so I would not be able to issue anymore DMCA Takedowns in order to get his channel banned again. But if he was going to do that, why would he choose this one video to leave up?

57.     As I alluded to earlier, this is the one video of his that, if taken in a vacuum and not as part of a trilogy, might actually have a nonfrivolous claim to fair use due to how little of my original video he uses. So the fact that he chooses this video as the sole one to keep up is extraordinarily telling. It heavily implies that he knows that it is the one video of his that is safest to keep up under copyright law.

58.     But upon that being established, that means that Baz cannot claim plausible deniability or ignorance of the law. It proves that he does in fact understand how fair use actually works. This means that his failure to follow fair use guidelines when making every other video about me is not being done in good faith. If he can properly vet his videos for fair use in this one case, he can do it in every other case. As Baz's actions clearly demonstrate, he knows full well what he is doing. He knows that his typical format (of playing large chunks of my videos and only occasionally stopping to make a comment) is not fair use, and he is making the conscious choice to follow that format anyway.

59.     This should be a factor weighing in favor of granting increased statutory damages under

17 USC § 504(c)(2).

### III-2-B: Infringement #2: First Stormcloaks Response

60.     On January 16-20, 2020, Baz posted a four-part series to his channel called "Acerthorn's 'Why You Should Side With the Stormcloaks' DEBUNKED," Parts 1-4 respectively. Part 4 of this series is the only video I am suing over today that I did not manage to back up, so we will have to subpoena YouTube for a copy of that video when the case gets underway.

61.     As the title suggests, this series was dedicated to responding to my First Stormcloaks Video. All four parts have since been removed, but if they were still visible, they could be viewed at the following URLs:

   (a)     Part 1: https://www.youtube.com/watch?v=u9Ev07adfvk

   (b)     Part 2: https://www.youtube.com/watch?v=w2OnyJZ2ey8

   (c)     Part 3: https://www.youtube.com/watch?v=KHE8XTOPOr8

   (d)     Part 4: https://www.youtube.com/watch?v=WF1Yn2KJFYA

62.     Across all four parts, Baz copied literally 100% of the First Stormcloaks Video, literally ever single last second of it. Baz plays long stretches of the original video without interruption, and only occasionally pausing to make a comment. For example, in Part 3, timestamp 5:57 - 7:43 (Clip 08 of the playlist of clips), he plays 1 minute 45 seconds of the original video before finally commenting on anything. And there are plenty of other examples besides that one. Across all four parts, there are numerous excerpts where he plays well over a minute of the original video without interruption. At no point was such excessive copying actually necessary to the criticism he was giving; it was pure excess for its own sake.

### III-2-C: Infringement #3: Civility Response

63.     On February 23, 2021 and March 25, 2021, Baz posted a two-part response video to the Civility video, titled "Everything Wrong with Acerthorn's Why I Demand Civility In the Comments of My Videos," Part 1 and Part 2, respectively. For simplicity's sake, I will refer to this 2-part response as "the Civility response" for the remainder of this case.

64.     If the videos were still publicly visible, you could view them at the following urls:

   (a)     Part 1: https://www.youtube.com/watch?v=zMpSK4lIj18

(b)     Part 2: https://www.youtube.com/watch?v=hVzcCMNgKy8

65.     Between both parts, 100% of my original video is used, literally every single last second of it. Not only that, but he only marginally criticizes the video, only occasionally stopping to make a comment. There are several moments when he plays long stretches of my video, multiple minutes on end, without stopping to give criticism. For example, in Part 1, at timestamp 23:21 – 26:36 (clip 22 in the playlist of clips), there's a 3 minute and 15 second stretch where he just plays my video without interruption. Also, in Part 2, at timestamp 5:25 – 8:43 (Clip 06 in the playlist of clips), we have a 3 minute and 18 second stretch of same. There are plenty of other examples besides these. These are just the only two examples where more than three minutes of my video were played without interruption, but there were plenty of instances where 90-120 seconds of my video were also played without interruption. At no point were any of these instances of excessive copying actually necessary to make the criticism he was making. It was just pure excess and pure greed for its own sake.

III-2-D: Infringement #4: Unauthorized and Unnecessary Use of "Acerthorn Channel Icon #6" during Part 2 of the Civility Response

66.     In addition to making a non-fair use of my Civility video, at timestamp 25:55 of Part 2 of his civility response, he also proceeded to criticize a few of the comments I left in the comment section of my own videos. While he is certainly allowed to criticize my comments, he also showed my at-the-time channel icon (Acerthorn Channel Icon #6) alongside these comments. There was absolutely no reason he needed to do that. He could very easily have placed red or black bars over the icon to obstruct it, or perhaps even cropped out the icon entirely.

67.     For a demonstrate of the latter, please see this video: https://youtu.be/G1TWOuUehzY. That is a video I posted after Baz's channel was terminated, boasting about my victory over him. At timestamp 58:19 of that video, you can see that I show one of Baz's community posts[4] where he complains about the copyright strikes he received from me. However, you will notice that I carefully cropped out the left side of these comments, where his icon (which may or may not have been copyrighted, but I did not wish to take the risk) was visible. I wasn't interested in

_____

4   Text-only posts, similar to comments on videos, that are not tied to any particular videos, but are instead associated with the entire channel.

critiquing the icon, so I didn't show the icon. Instead, the only thing I showed was the thing I actually wanted to critique: The comment itself.

68.    That is what Baz should have done with my comment and icon. But he didn't. He simply displayed my icon brazenly, without criticizing it, and without any necessity to display it. Rather, pursuant to the delusional belief mentioned above about how fair use works, he believed that, since he was providing some nominal criticism towards me in any capacity, no matter how slight the quantity or quality, he automatically and necessarily had carte blanche to use whatever content of mine he so desired, without regard to necessity, excess, or anything else, simply because he and many other YouTubers delusionally believe that is how fair use works.

<u>III-2-E: Infringement #5: Elden Ring Response</u>

69.    On July 14, 2022, Baz posted a video to his channel called "Bashing Acerthorn's Stupid Political Tweets (plus his Idiotic Review of Elden Ring)." As the name suggests, the latter half of this video (specifically, beginning on timestamp 26:24) has him responding to my Elden Ring video. For simplicity's sake, I will refer to this response as "the Elden Ring response" for the remainder of this complaint.

70.    If the video were still publicly visible, it could be viewed at the following url:

https://www.youtube.com/watch?v=F8FCdbryyVw

71.    Just like with the civility response, Baz copies literally 100% of the original Elden Ring video, every single last second of it. This time, the original video was only 3 minutes and 49 seconds long, so the excerpts which he copies without interruption are naturally going to be much shorter, but they are still far in excess of what was actually necessary in order to make the criticism he wanted to make. For example, at timestamp 29:34 – 30:40 (Clip 10 in the playlist of clips), he plays a 1 minute and 6 second clip of my video before finally stopping to give any criticism, when he could very easily have only copied the final 12 seconds before finally pausing[5]. Also, at 31:08 – 32:05 (Clip 14 of the playlist of clips), he plays the final 56 seconds of my video, but then proceeds to give his critique of the video as a whole, meaning he could have conceivably omitted that 56-second clip in its entirety without losing anything in the way of providing context for his criticism (which is supposedly the whole reason why some limited

---

5   I demonstrate as much at timestamp 1:11:33 – 1:12:13 of the "victory boasting" video mentioned above.

copying of copyrighted material is necessary to make criticism in the first place).

72.    Those two clips alone amount to 2 minutes and 3 seconds of excessive copying. Since the original Elden Ring video was only 3 minutes and 49 seconds long, that means that these two clips alone constitute a majority of the original Elden Ring video's total length! Even if you don't count the aforementioned 12 seconds mentioned above, which I concede could have reasonably been kept in order to make his criticism, the remaining 1 minute and 51 seconds of unnecessary copying still amounts to approximately 48% of the original video's length that Baz did not need at all in order to make his criticism, and that doesn't even take into account any other clips where his copying would (in all likelihood) be considered excessive and unnecessary to make his points.

### III-2-F: Infringements #6-#7: Victim Video

73.    On May 30, 2022, Baz posted a video on his channel called "No, Acerthorn, You are NOT the Victim." For simplicity's sake, I will refer to this video as "the Victim Video" for the rest of this Complaint. If this video were still visible, it could be viewed at the following URL: https://www.youtube.com/watch?v=ygIGW6JN-hw

74.    This video was a response to not one, but two of my videos: The Ducking Video and the Aaron Video. Throughout this video, he proceeded to play the entirety of both videos, literally every single last second of each of them, only occasionally stopping to give his own thoughts on the matter. Long stretches of each video would be played without alteration or addition from him. For example, at timestamp 12:43 - 15:09, timestamp 20:24 - 22:35, and timestamp 29:17 - 31:41 (Clips 12, 20, and 36, respectively, in the playlist of clips) are three sections where he played more than two whole minutes at a time before finally stopping to give any criticism. At no point was this excessive copying actually necessary for the criticism he was giving; it was pure excess for its own sake.

### III-2-G: Infringements #8-#17: Second Stormcloaks Response

75.    For the next ten counts of infringement, Baz proceeded to make a multi-part series responding to the Stormcloaks video. For simplicity's sake, I will refer to this multi-part series as the "Second Stormcloaks Response" for the rest of this case. He only managed to post three parts

of this series before I had his channel terminated through DMCA Takedowns and copyright strikes, but he made it clear, in Part 1 of his series, that, once he had completed the entire series, he would have copied literally 100% of the Stormcloaks video, literally every single last second of it.

76.     If the series were still publicly visible, they could be viewed at the following urls:

    (a)     Part 1: https://www.youtube.com/watch?v=rWxBy9xY93M

    (b)     Part 2: https://www.youtube.com/watch?v=MAHQAx3U6_s

    (c)     Part 3: https://www.youtube.com/watch?v=4idQ5q8ox7Y

77.     His use of footage from my March 25 video begins at timestamp 2:47 of Part 1, at timestamp 1:21 of Part 2, and timestamp 1:21 of Part 3. Remember that it is the music, not the entire video, that I am suing over in this section of the Complaint. The Stormcloaks video is merely the video where these songs were used, so Baz's copying of the Stormcloaks video constitutes the use of my copyrighted music.

78.     In all three parts he managed to post before his channel was terminated, he played all ten of the copyrighted songs that I used as background footage for the Stormcloaks video. I will provide timestamps where all ten songs are played when the case moves onto discovery, but all ten are there.

79.     Although Baz provides *some* criticism (not really extensive or thorough criticism, but criticism nonetheless), he copies far more of the Stormcloaks video than what is actually necessary for him to make this criticism. At multiple points in his response, he plays several minutes worth of the Second Stormcloaks video uninterrupted, only occasionally stopping to make rebuttal arguments. Entire sections of the Stormcloaks video would be played in their entirety without him stopping once to give even a single sentence of criticism. For example, in Part 1, timestamp 27:00 – 29:23 and again at timestamp 37:46 – 39:32 (Clips 26 and 38, respectively, in the playlist of clips), my "Undisputed Facts" #1, #2, #7, #8, and #9, as well as the prologue and epilogue to the entire "Undisputed Facts" chapter of the video, were all played ***in their entirety*** without Baz stopping once to give even a single sentence of criticism!

80.     Even in sections where he stopped occasionally to provide criticism, he still copied much

more of my video than was necessary to make his criticism. For example, in Part 2, at timestamp 3:41 – 8:14 (or Clip 04 in the playlist of clips), there is a **four minute and 33 second stretch** of my video being played without interruption before he finally stops to make a comment! The criticism he then proceeds to give is only relevant to the eight seconds immediately before he paused. This means that there was a total of 4 minutes and 25 seconds of my footage that he could have removed from his response video because it had no bearing on any of the criticism he was providing, and he just didn't.

81.     The music that I had playing in this section of the video was "Section of Life." As you can see from the unlisted playlist provided above, that song is normally 3 minutes 8 seconds long. I had it playing on a loop in the background in this section of the Stormcloaks video (which, as the copyright holder, I was well within my right to do; no fair use necessary). This means that, in the aforementioned 4½ minute segment, Baz played **more than one hundred percent** of that copyrighted song, without stopping to give criticism once!

82.     At 2:33 of Part 1, he says he will only debunk about 20 minutes of my video at a time, and at timestamp 39:52 of Part 1, he admits that there is "still plenty to come." In other words, by the time he finishes this series, he will have copied *the entirety* of my Stormcloaks video, literally every single second of it, while only responding to and criticizing a very small portion of it. He was not able to finish the series before I had his channel terminated, but he has made it clear that this is what he planned to do.

<u>III-2-H: Infringements #18-#21: Censorship Video</u>

83.     This has to be the most egregious instance of copyright infringement of the entire bunch, and considering that his infringements up to this point involved him playing 100% of the original videos, and playing long, multi-minute stretches of them without interruption, that's saying quite a lot.

84.     On April 3, 2022, Baz posted a video to his YouTube channel called "Acerthorn is a Disingenuous Censor and He Needs to Stop!" If this video were still visible, it could be viewed at the following URL: https://www.youtube.com/watch?v=baJNWQXSe2w

85.     At timestamp 11:34 - 14:46 of this video (Clips 2-5 of the playlist of clips), he played

four of my videos from my "Retorting Against Mean Comments" series. Specifically, he played the Incest Video, Fractions Video, Trauma Video, and Nirvgorilla Video.

86.     At this point, you should know the routine by now. He played literally every single second of all four videos, literally 100% of their durations. However, this time, he somehow made it even worse. He played all four of these videos, back to back, in their entirety, without stopping to give criticism once! He didn't even play large portions of the videos without interruption, but literally all four videos were played in their entirety without interruption!

87.     Then, as if that weren't enough, he then explicitly declined to give any transformative value! Yes, at timestamp 14:46 - 14:50 (the beginning of Clip 6 in the playlist of clips), after a whopping 3 minutes and 12 seconds of just playing four of my videos in their entirety without commenting on them once, he then simply states "Those don't even need further comment."

88.     Think about that for a minute: Even Baz admits that being transformative is essential to obtaining fair use. Of course, we heavily disagree on whether or not *that's all he needs*, but even he admits that he needs at least that. But here? After copying 100% of four different copyrighted works, he then declines to give even that much! The one thing even he admits is necessary for fair use, and he declines to give it, while still having the audacity to insist (often vulgarly so) that his videos about me are all fair use! This man has absolutely no shame!

89.     Baz's brazen and egotistical use of my copyrighted content in this case actually reminds me of a hypothetical scenario that I, as well as famed lawyer-turned-YouTuber "Legal Eagle," both used in the following two clips:

(a)     https://youtube.com/clip/Ugkxc22BAZ1ultCy3a7G3JzOSrJ9Qi1v6OKC

(b)     https://www.youtube.com/clip/UgkxViUPYvI8E8H1L51QYXVIpc4XJl95aIre

90.     In both of those clips, the scenarios that we described were entirely hypothetical … because Legal Eagle and I both assumed that nobody would be dumb enough to actually do that for real! But here, not only did Baz do it for real, he did it *four times over*, and he STILL somehow has the audacity to say that I am the one engaging in copyright abuse!

### III-3: DMCA Counter-Notification, Libel, and DMCA Misrepresentation

91.     On January 3, 2024, I received an email from YouTube stating that Baz had issued

DMCA Counter-Notifications against four of the five videos that had been stricken: Parts 2 and 3 of the Second Stormcloaks Response, as well as both parts to his Civility Response. Receiving this notice prompted me to file this Complaint with this Court.

### III-3-A: The false statement of fact regarding my beliefs

92.     However, in addition to simply pleading fair use, he also included the following statement in his Counter-Notification:

> *"The one who sent the copystrike seems to have erroneously assumed that it wasn't fair use simply because I used his content on my videos, but that's simply not true."*

93.     This is not his opinion. This is a statement of fact. He is claiming what I believe, rather than his own opinion, which is a statement of cast-iron objective fact. He is making a statement of fact about my perception of reality and my understanding of the law. Therefore, it is just as defamatory as if he were to state I was a Nazi-sympather, or that I believe that child molestation should be legalized. Even if he never accused me of engaging in any overt actions pursuant to those beliefs, publicly stating that I hold the beliefs in the first place is still defamatory.

94.     Moreover, this is a belief that, if I did indeed hold it, would be just as delusional as his belief in the simplicity of fair use, as described in ¶ 33 above.

95.     However, this statement is demonstrably false, and made in knowing disregard to the mountains of evidence to the contrary. Therefore, it qualifies as an act of libel. Furthermore, since my alleged failure to consider fair use is material to the DMCA Takedown, that means it also qualifies as a "false material statement" for purposes of 17 USC § 512(f)(2).

96.     While I have provided numerous pieces of rebuttal evidence, one of them which is especially relevant in this particular case is the video I mentioned earlier in this Complaint, in ¶ 38 above. That video, more than anything else, is especially pertinent to the instant case, since it, more than any other public statement I have ever made on the subject of fair use, he should be privy to that video more than anything else, seeing as he was the main subject of that video. More than any other public statement about the topic of fair use, his failure to consider the contents of that video constitute "burying his head in the sand."

97.     In that video, I spent over an hour explaining in exquisite detail how his response videos

3:23-cv-00322-TLT                                  -20-                            Amended Complaint

fell short of the bar to be considered fair use. At no point in that 82-minute video did I state, or even imply, that I felt his videos "wasn't fair use simply because [he] used [my] content on [his] videos" (a belief that, if I did indeed hold it, would be just as delusional as his belief regarding the simplicity of fair use, as explained in ¶ 33 above). In fact, at multiple points in the video, I made statements and asked rhetorical questions which are wholly incompatible with that delusional view, including, but not limited to, such statements as …

(a)     Timestamp 1:42 – 1:58

"I thoroughly explained that playing *the entirety of my video*, just with occasional commentary over it, is a surefire way to kill your case for fair use"). The emphasized words "the entirety of my video" clearly imply that only taking short excerpts from my video is acceptable.

(b)     Timestamp 28:54 – 29:08

"He provided *some* criticism. The problem is that he copied way, way more of my Stormcloaks video than he actually needed in order to make his criticism"). This line clearly shows that it is the amount copied, not simply that he copied any at all, that kills his case for fair use.

(c)     Timestamp 40:04 – 40:37

"Now the thing that's most frustrating about all of this is that Templar had a case for fair use practically gift-wrapped for him. Literally all he had to do was take out the parts of my video that he didn't need in order to make his criticism. If he had simply done that, he would have had a much stronger case."

(d)     Timestamps 31:35 – 31:49 and 1:11:33 – 1:11:55, two times where I concede that he might have had a colorable claim to fair use if he had simply used less of my videos before giving the criticism, clearly showing that I concede that some limited copying is allowed under fair use, just not the unlimited copying that he actually engaged in.

(e)     Timestamp 54:30 – 56:08

"I cannot emphasize this enough: YOUTUBE'S OWN LAWYERS agreed with me that it is not fair use! How can my case possibly be frivolous?! … even if by some miracle, later down the line, it turns out that it isn't fair use, how can you possibly say that I had an objectively unreasonable basis for thinking it wasn't when YouTube's own lawyers agreed with me after a manual review?!"

98.     Just from those excerpts alone (and many, many others just like it), anyone with half a brain can tell that I do not believe that an infringement of a copyrighted work is automatically not fair use simply because it uses my copyrighted content. His stubborn refusal to acknowledge this truth about my position, and his stubborn determination to continue to straw-man my position, constitutes actual malice: He either knows that his statement about me is false, or acts in reckless disregard to overwhelming evidence to the contrary.

99.     Even if, by some miracle, he manages to prevail on the issue of fair use, that still doesn't exonerate him of the libel here. Even if I ultimately am wrong about the limitations of fair use, that doesn't mean I felt that it wasn't fair use "simply because [he] used [my] content on [his] videos," yet the latter is what he accused me of believing. The latter is still demonstrably false (and therefore libelous) even if he ultimately does prevail on fair use.

100.    At this point, the only way he could possibly claim that he was telling the truth (or at the very least, that he reasonably believed in good faith that he was telling the truth) is if he had some kind of objective evidence of pretext. That is to say, he has some empirical evidence that I don't actually believe any of the stuff I stated in ¶ 67 or that I will go on to discuss in Section IV-2 of this Complaint. Instead, I am lying about my belief in the validity of those factors as a pretext, and that, deep down inside, I really do believe that using my copyrighted content in any capacity is automatically a bar to fair use. But I highly doubt he can produce any real, objective, empirical evidence to that effect.

101.    Therefore, this statement not only constitutes libel per se (a false statement of fact that portrays me as being unfit for my chosen profession of making YouTube videos), but also misrepresentation under 17 USC § 512(f)(2), because it is a knowingly false statement that is material to the DMCA Takedowns I issued against him.

<u>III-3-B: My Demand for Retraction</u>

102.    Later that night on January 3, 2024, I sent an email to Baz, explaining what I said above, demonstrating how his statement regarding my beliefs was libel, and demanding that he retract that statement about me.

103.    As of the time of this writing, I have not received any notice that he has retracted, or even

attempted to retract, the libelous statement pursuant to this demand. Therefore, I am now eligible for general damages pursuant to the libel, including for emotional distress, loss of reputation, and punitive damages.

III-3-C: Injuries I have suffered from the defamation

104.    In addition to statutory damages for the copyright infringement, I also seek to recover damages for emotional distress and loss of reputation caused by the libel.

105.    The libel which Baz published about me is not the only instance of this defamation that has occurred. It is only the most recent instance of a widespread series of accusations against me, of which Baz is only one of many participants. By participating in this smear campaign willingly, he has become jointly liable for the injuries I have suffered as a result of it, the same as any other co-conspirator. It's just the same as how the driver of a getaway car during a bank heist is just as liable for all crimes committed and all plaintiffs he injures as the people who personally took the money out of the vault and/or fired any shots.

106.    Case 4:23-cv-00321-DMR (Stebbins v. Doe) is also a slander lawsuit, currently pending before this court, that documents all the harm I have suffered as a result of this widespread smear campaign. See Dkt. 1 (Complaint), ¶¶ 132-141 of that case for a description of the emotional distress, loss of reputation, and even life-threatening stress-related illnesses I have suffered as a result of the harassment and stochastic terrorism caused by that smear campaign. You can also see Case 4:22-cv-00546-JSW (Stebbins v. Rebolo), Dkt. 32, ¶¶ 53-140 for an abridged description of the harassment and stochastic terrorism I have been subjected to that lead to all this emotional distress and life-threatening stress-related illnesses.

107.    Now that Baz has willingly participated, not just in the copyright infringement, but also the defamation, he deserves to be jointly liable for all the harm this defamation has caused me, even if his own personal contributions may have amounted to an infinitesimal portion of the overall collective pot. It's just the same as how the driver of a getaway car during a bank heist is just as liable for all crimes committed and all plaintiffs who are injured as the people who personally took the money out of the vault and/or fired any shots.

### IV: LEGAL ARGUMENT

108.    The following laws are applicable to this case.

### IV-1: Prima Facie Copyright Infringement

109.    "There are only two elements necessary to the plaintiff's case in an infringement action: ownership of the copyright by the plaintiff and copying by the defendant." See Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F. 2d 1148, 1151 (9th Cir. 1986).

110.    Baz has undeniably copied from my First Racist, First Stormcloaks, Civility, Elden Ring, Ducking, Aaron, and Second Stormcloaks videos (which in turn means he also copied from my copyrighted songs). He also copied the four "Retorting Against Mean Comments" videos I mentioned earlier. He also undeniably copied my icon at timestamp 25:55 of Civility Response Part 2. Therefore, for all twenty-one counts of infringement, the second essential element of copyright infringement has been sufficiently plead.

111.    Meanwhile, the factual allegations in ¶¶ 6-38 sufficiently allege that I own the copyright in the works that I am suing over today.

### IV-2: Fair Use

112.    As I have been alluding to throughout this Complaint, fair use is most likely going to be the defendant's primary defense.

#### IV-2-A: Criticism & Commentary

113.    While it is true that Baz *occasionally* provided criticism of my videos, he only does so very sparingly. Even then, not all of his original commentary could truly be classified as "transformative." For example, in the Second Stormcloaks Response Part 2, at timestamp 15:40 (Clip 15 in the playlist of clips), Baz merely exclaims in frustration, but fails to provide any actual commentary or criticism. Meanwhile, in that same video, at timestamp 18:52, he simply says "No it doesn't." These two clips do not meet the legal threshold to be considered "transformative." In order to be transformative, "[t]he use must be productive" and must aid "in the creation of new information, new aesthetics, new insights and understandings." See Seltzer v. Green Day, Inc., 725 F. 3d 1170, 1176 (9th Cir. 2013). From these two clips (and others like it), we gain no genuine insight or understanding of the Second Stormcloaks video, other than the fact

that he just doesn't like the video. At best, this should be considered the bare minimum amount of criticism.

114.    However, while other parts of his videos are a bit closer to being considered "transformative," it is important to realize that this is where his case for fair use begins and ends. Even if every other piece of criticism he provides fits the criteria to be considered "transformative" to a tee (which I dispute), the defendant's case for fair use must still fail because Baz has utterly failed to meet even a single other factor of fair use in his favor.

IV-2-B: Commercialization

115.    These two videos were commercialized. Even if Baz is not a member of the YouTube partner program (and even that has yet to be proven), YouTube itself is still profiting off of these videos being on its site. YouTube always puts ads on every video, even if the channel owner is not part of the YouTube Partner Program. See https:www.searchenginejournal.com/youtube-is-showing-ads-on-non-monetized-channels/388674/ ("YouTube is running ads on non-monetized channels, but the creators aren't receiving a share of ad revenue").

116.    If prior communications are anything to go by, the defendant is sure to argue that the infringing videos should not be considered "commercialized" unless Baz himself is directly profiting off of them. But that is not how the law works. In fact, it is literally the complete opposite. If anyone, at any point in the distribution of the infringing article, makes any money from its distribution, then the infringing article is commercialized, and everyone who is otherwise legally culpable for its distribution must acknowledge its commercial nature. See https://www.insidehighered.com/views/2011/08/02/myths-about-fair-use:

> **"Myth #3: Fair use is easy for an academic — I can take whatever I want because everything I do is noncommercial.**
>
> **Reality**: Working noncommercially does give you some privileges, but you'll be stuck in a gray zone if you depend on that to justify fair use. You won't be able to circulate your work in academic journals (they carry ads) or books (even nonprofit publishing houses sell their books). Even when you contribute for free to online sites, somebody's conducting commercial activity — perhaps an advertiser placing ads on a site, or a data miner."

117.    In other words, even if Baz did not personally see one cent of any of the revenue made

from his response videos, they would still be considered "commercialized," simply because someone, somewhere, is making money off of them in some capacity.

118.    But even if the Court disagrees with me, and finds that Baz himself must have personally profited from the videos, the Court cannot make that factual finding on a § 1915 review or on a Rule 12(b) Motion to Dismiss. At the pleading stage, the Court must accept all facts in the complaint as true and in a light most favorable to the Plaintiff. This means that, for the purposes of the Complaint, the Court must assume that the video is being commercialized by Baz in some capacity, and then work from there. Then, Baz will have to testify to what extent he is, directly or indirectly, profiting off the infringing videos, or whether he even has any hopes of ever profiting off of them in the future. But that is a bridge the Court and I will have to cross when we come to it.

<u>IV-2-C: Factor #2: Nature of the Copyrighted Work</u>

119.    First, as I mentioned earlier, all of the copyrighted works that I am suing over today are all unpublished. See Section III-1-K above. This automatically means that the second factor of fair use must weigh against the defendant, regardless of the level of creativity in the original work. See Monge v. Maya Magazines, Inc., 688 F. 3d 1164, 1177-78 (9th Cir. 2012) (holding that the "unpublished" sub-factor outweighs the "nonfiction" sub-factor).

120.    However, even if the Court disagrees with my interpretation of Circular 66 and insists that the songs are all published, the second factor must still weigh against fair use because these works are all highly creative. Music is inherently creative, and since the ten songs are what I have a copyright registration over and what I am officially suing over (at least in regards to Infringements #4 - #13), that is the element of the Stormcloaks video that should be considered when discussing the second factor of fair use.

121.    But even barring that, even the elements that are entirely unique to the Stormcloaks video are still highly creative. For example, at timestamp 3:09 – 3:36 of the Stormcloaks video (which was included in Part 1 of Baz's infringing series, at timestamp 8:03 – 8:08, without him even commenting on or criticizing it), you can see me making a statement that is, indeed, extremely expressive. Similarly expressive statements can be found all throughout the Stormcloaks video,

including at timestamps 43:46 – 43:53, 1:39:45 – 1:40:06, 2:02:04 – 2:02:32, and 2:21:19 – 2:21:32, just to name a few.

122.    Of course, I am not currently suing over the Stormcloaks video itself, but if Baz can get fair use over the Stormcloaks video, he also has fair use over the ten background songs, so it is still worth addressing.

123.    Even the Civility and Elden Ring videos qualify as "highly creative" in this regard, even if they weren't unpublished. Those two videos are dominated by my opinions, not statements of cast-iron objective fact. Therefore, the second factor should weigh against fair use. See Cambridge University Press v. Patton, 769 F. 3d 1232, 1270 (11th Cir. 2014):

> "[W]e find that the District Court erred in holding that the second factor favored fair use … Where the excerpts of Plaintiffs' works contained evaluative, analytical, or subjectively descriptive material … or derives from the author's experiences or opinions, the District Court should have held that the second factor … weighed against fair use in cases of excerpts that were dominated by such material."

124.    The same is also true about the Stormcloaks video: Dominated by opinions and evaluative, analytical, and subjectively-descriptive material.

125.    Therefore, whether the works are unpublished or whether the works are highly creative, the second factor weighs heavily against fair use.

<u>IV-2-D: Factor #3: Amount & Substantiality of Portion Taken</u>

126.    In all instances that I am suing over in this case, Baz copied 100% of the original videos, literally every single last second of them. This is an egregious violation of the third factor of fair use. In fact, it used to be the precedent in the 9th Circuit that, whenever a secondary user copied the entirety of the original work, that precluded fair use in its entirety. See Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F. 2d 1148, 1155 (9th Cir. 1986).

127.    Although that is no longer the case, the 9th Circuit has nonetheless held that using the entirety of the original work still means that the third factor weighs against fair use as a matter of course, without the district courts being afforded any discretion in this regard. See Worldwide Church of God v. Philadelphia Church of God, Inc., 227 F. 3d 1110, 1118 (9th Cir. 2000) (citing Hustler, supra at 1155). While it is theoretically possible to still get fair use overall while copying

100% of the original work, the district court must still find the third factor to weigh against fair use as a matter of binding precedent.

<u>IV-3-E: Effect on the Market</u>

128.    "This last factor is undoubtedly the single most important element of fair use." See De Fontbrune v. Wofsy, 39 F. 4th 1214, 1226 (9th Cir. 2022) (citing Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 US 539 (1985)). Moreover, it is the one factor that has been expressly affirmed by the Supreme Court as being singularly capable of negating fair use in its entirety, all on its own. "[T]o negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the potential market for the copyrighted work." See Monge, supra at 1182 (emphasis in original). "If the defendant's work adversely affects the value of any of the rights in the copyrighted work … the use is not fair." Harper & Row at 568.

129.    It is also important to note that the defendant necessarily holds the burden of proof on this issue. See Dr. Seuss v. Comicmix, 983 F. 3d 443 (9th Cir. 2020), which unequivocally calls upon the defendant, "as the proponent of the affirmative defense of fair use," to "bring forward favorable evidence about relevant markets," and stating that this is one of the few "absolute statements" when it comes to fair use. See id at 458-60.

130.    I am not required to allege market harm in the Complaint. See Peterman v. Republican National Committee, 320 F. Supp. 3d 1151, 1157 (MT 2018) ("[I]t is not necessary to plead facts that disprove fair use to survive a Rule 12(b)(6) motion to dismiss"). The fact that I am offering to make a token argument here is a courtesy, not a requirement.

131.    That being said, Baz has copied the entirety of my First Racist, First Stormcloaks, Aaron, Ducking, Civility, Elden Ring, and Retorting Against Mean Comments videos, and he has made it clear that he plans to cover the entirety of my Second Stormcloaks video in his current format (where he plays long stretches of the video and only occasionally intersperses them with brief excerpts of criticism) if given the chance to. He was not allowed to finish the series before his channel was taken down, but he has made it clear that this is his intention. If he is allowed to complete this series under this format, he will have copied literally 100% of the Stormcloaks video, literally every single last second of it.

132.    This constitutes a market substitute, per se.

(a)     See Hustler Magazine v. Moral Majority, 796 F. 2d 1148, 1154 (9th Cir. 1986)

"[B]y copying all or substantially all of the copyrighted work, the distinction of
function vanishes since whatever the intent of the copier, a verbatim reproduction
will of necessity serve the function of the plaintiff's work as well as that of the
defendant's."

(b)     See also Cambridge University Press v. Patton, 769 F. 3d 1232, 1271 (11th Cir. 2014)

"A book reviewer who copies snippets of a book is likely to increase the demand
for the book, but were a book reviewer to quote the entire book in his review …
he would be cutting into the publisher's market, and the defense of fair use would
fail."

(c)     See also Consumers Union of US v. General Signal, 724 F. 2d 1044, 1051 (2nd 1983)

"The fourth fair use factor will come into play if too much is copied or if the
entire plot is revealed, thereby usurping the demand for the original work."

(d)     See also https://youtu.be/1Jwo5qc78QU?t=1158 (timestamp 19:18 - 20:22)

"Mystery Science Theater was … absolutely transformative, but they still licensed
the movies … because yeah, playing someone else's entire movie, just with
wisecracks over it? Probably not fair use!"

(e) See www.youtube.com/clip/UgkxDPeQBnbcZAewwjxh7tHyYQPpeMkYUrNS

"by showing those clips in full to the audience … it's entirely possible that you
might not watch the [original] videos because you saw, basically, the whole thing
in [the defendant]'s videos."

(f) www.youtube.com/clip/Ugkxp9Ev6N8qsYViDPqkrtAuE8nZZWpq8oD7

"if it completely displaces the market for the original, it's probably not fair use,
and it's pretty obvious that, once you see a video during a [response to it] …
you're not gonna go back and watch the whole video again."

(g)     See also www.youtube.com/clip/Ugkxznh99XHVyjyPhyQKWiWE_n8XASNgbpxW

"Honestly, were it not public domain, I don't think it would meet the
transformative requirements for fair use parody protection. Large parts of the
original text are copy-pasted pretty much verbatim, punctuated only occasionally
with Arabella's cynical or horrified thoughts on the matter … this isn't really Matt
Youngmark's book; it's Frank L. Balm's book with sarcastic commentary penciled

into the margins."

133.    Therefore, if the Defendant wishes to argue fair use, he has some heavy lifting to do when it comes to proving a lack of market substitute.

IV-3-F: Fair Use in Conclusion

134.    In conclusion, we have three of the four factors weighing definitively against fair use, with one factor (the first factor) being an extremely borderline case, given how few and far between the criticism actually is, and how undeniably commercial the site on which it is hosted is. See Monge v. Maya Magazines, Inc., 688 F. 3d 1164, 1177 (9th Cir. 2012) ("[The Defendant's] minimal transformation of the [original work] is substantially undercut by its undisputed commercial use. On balance, the first factor is at best neutral, and does not support [the Defendant]'s claim of fair use") (citations omitted).

135.    With 3½ factors weighing against Baz as a matter of course, that leaves criticism as his last bastion of hope for obtaining fair use. However, with 3½ factors weighing against him right out of the gate, then unless the criticism he provides is ***absolute gold*** – not just giving dissenting opinions, but extremely insightful, downright philosophical commentary, the kind that Confucius himself would tip his hat to – then his case for fair use is effectively dead on arrival.

136.    The defendant had a case for fair use practically gift-wrapped for him. All he had to do was remove all the parts of my videos he didn't need in order to make his criticism. If he had just done that, he would have had a much stronger case. But he felt that was beneath him.

137.    Contrary to common misconception, the addition of a nonzero amount of criticism, no matter how few and far between, does not automatically guarantee that your video is fair use, to the exclusion of all other factors. This is the misconception that Baz and many other YouTubers just like him fall victim to, but that is not actually how the law works. See Dr. Seuss Enterprises, LP v. COMICMIX LLC, 983 F. 3d 443, 452 (9th Cir. 2020) (citing Monge at 1173) ("While the analysis of … fair use … may be guided by the examples given in the preamble to § 107, i.e., criticism, comment, news reporting, teaching, scholarship, and research, not even these works compel a per se finding of fair use") (citations and quotations omitted).

138.    Therefore, the claim for fair use which the Defendant is sure to attempt to raise in this

case must fail.

## IV-3: Libel

139.    The tort of libel involves (a) a publication that is (b) false, (c) defamatory, (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage. See Taus v. Loftus, 54 Cal.Rptr.3d 775, 804 (2007).

140.    The statement referenced in ¶ 87 was submitted to YouTube's copyright enforcement department. This counts as "publication" because it was communicated to at least one third party.

141.    To be false, it must first be a statement of fact, or at least mixed fact and opinion. Fortunately, the allegations of ¶ 88 above sufficiently establish Baz's statement as one of fact.

142.    As for being false, the allegations of ¶¶ 90-93 above (and especially ¶ 92 and its corresponding sub-paragraphs) sufficiently plead facts which prove the statement to be false.

143.    The third element – defamatory – only means it is "injurious to reputation." See https://www.dictionary.com/browse/defamatory. Baz's statement about me clearly meets this requirement. By accusing me of holding this highly delusional belief about how fair use works, he is attempting to portray me as completely delusional and entirely disconnected from reality.

144.    Unprivileged just means that it wasn't stated in any capacity where a speaker has the absolute privilege to publish defamatory material, such as during a Congressional floor debate or during litigation. This is obviously not present here.

145.    As I explain in Section III-3-C of this Complaint, as well as the thereby incorporated paragraphs of other filings, the smear campaign (of which Baz is now a willing participat) has resulted in thousands of people harassing me, to the point of me suffering life-threatening pneumonia due to the stress and anxiety. As a result, this defamation absolutely qualifies as having a natural tendency to injure.

146.    Therefore, Baz's statement about me mentioned in ¶ 62 of this Complaint meets all the requirements to be actionable libel.

## IV-4: DMCA Misrepresentation

147.    The same statement which constitutes libel also constitutes DMCA misrepresentation under 17 USC § 512(f)(2). In order to violate that statute, a DMCA Counter-Notification must

make a representation to the ISP (in this case, YouTube) that is (A) material to the Counter-Notification and/or its corresponding DMCA Takedown, (B) false, and (C) the defendant either knew it was false or acted with reckless disregard to its falsity, similar to the threshold for defamation of a public figure as set forth in New York Times Co. v. Sullivan, 376 U.S. 254 (1964).

148.    The statement mentioned in ¶ 87 undoubtedly counts as a "representation." It is also false for reasons I have already stated when discussing the law of libel. It is undoubtedly "material" to the DMCA Counter-Notification because it heavily implies that my DMCA Takedown was bordering on violating 17 USC § 512(f)(1) in its own right.

149.    A statement does not have to be singularly dispositive of the DMCA Takedown (such as a total failure to consider fair use in any capacity) in order to be considered "material." As my state's Supreme Court frequently finds, "evidence need not conclusively prove the ultimate fact in issue … To be relevant evidence it need only be a brick, not a wall." See Walker v. State, 783 SW 2d 44, 46 (1990)[6] (citations and quotations omitted).

150.    The factual allegations contained in ¶¶ 90-93 (and especially ¶ 92 and its corresponding sub-paragraphs) sufficiently establish that the Defendant either knew this statement was most likely false or actively buried his head in the sand regarding evidence that it was false.

151.    Therefore, I have sufficiently plead DMCA Misrepresentation.

### V: RELIEF REQUESTED

152.    For the 21 counts of copyright infringement, I request the following relief:

### V-1: Statutory Damages for copyright infringement

153.    First, I request statutory damages of $150,000 for each of the ten different copyrighted works that were infringed. Because there are twenty-one (21) counts of infringement, this comes out to a total of $3,150,000 in statutory damages.

154.    I am eligible for statutory damages for all 21 counts of infringement under 17 USC § 412(2). The ten copyrighted songs were all registered on March 5, 2023, which predates Baz's infringement of them, so I am eligible for statutory damages there.

155.    For the other videos, it's a little more complicated. In those instances, we must remember

6   https://scholar.google.com/scholar_case?case=13786370352728227242

that all of these works are, at least officially, unpublished, for reasons I explain in Section III-1-K of this Complaint. For this reason, I can apply for registration of those works *whenever I want*, and I would still be eligible for statutory damages. After all, any registration date is necessarily "within three months after the first publication[7]" if *there is no first publication*!

156.    Therefore, I am eligible for statutory damages for all 21 counts of infringement.

### V-2: Damages for libel and DMCA Misrepresentation

157.    For the libel and DMCA misrepresentation, I ask for damages for emotional distress and loss of reputation in the amount of $1,000,000 USD. This is the same that I am requesting from SidAlpha in Case 4:23-cv-00321-DMR. As I explain in the Complaint in that case, the dollar amount is based roughly on what the cost of my hospitalization and surgery would have been if I were not insured, and so is used as an approximation of the value of emotional distress, loss of reputation, and pain and suffering that I have suffered as a result of all of the harassment and stochastic terrorism that the smear campaign (of which Baz is now a willing participant) inflicted upon me.

158.    I also ask that the Court award me an amount of punitive damages, up to ten times the aforementioned compensatory damages, to sufficiently deter the defendant and others like him from participating in this smear campaign in the future.

### V-3: Injunctive Relief for Copyright Infringement

159.    For all counts of copyright infringement, I ask for the following injunctive reliefs:

160.    First, I ask that he be made to remove all instances of my copyrighted content from all of his social media accounts in their entirety, pursuant to 17 USC § 502.

161.    Second, I ask that he be made to hand over all of his computers, smartphones, and other devices on which my copyrighted content may potentially be stored, and that they be impounded and purged of all instances of my copyrighted content, pursuant to 17 USC § 503.

162.    I ask that the Defendant be made to pay, in the first instance, all costs associated with compliance with these injunctions.

### V-4: Injunctive Relief for Libel and DMCA Misrepresentation

163.    In response to his libel and DMCA misrepresentation, I ask that he be ordered to publicly

---

7   17 USC § 412(2)

correct the statements he made about me in such a way that ensures that my reputation is fully restored. He should not be required simply to tell everyone that he was wrong, but to *actually convince* them, to the point where literally everyone on Earth, with no exceptions, has either never heard of this controversy in the first place, or their must *subjectively believe* that I am the blameless victim of copyright infringement that is not fair use (and that Baz willingly and maliciously participated in same), and absolutely nothing else.

164.    That sounds impossible, but it really is not. Such feats have been accomplished in the past. One of the most famous examples of this happening is the plaintiff in the case of Liebeck v. McDonald's Restaurants, also known as the "McDonald's coffee case." For several years after that case concluded, Ms. Liebeck was branded as a greedy vexatious litigant (much like what Baz and his allies are attempting to do to me), but now, in the 2020s, it is virtually unheard of to find a person who still genuinely believes that. Nowadays, the efforts to correct the story have been so successful and so thorough that the only time you ever hear the original story is when the person telling it is specifically setting up to explain how that misconception has been thoroughly disproven.

165.    So that alone proves that it is not impossible to fully restore my reputation. It may be difficult, and it may be expensive, but that alone has never stopped a court from issuing an injunction that substantial justice otherwise requires.

166.    In practice, this would mean that Baz would be held in contempt of court (including invoking the USA's extradition treaty with Brazil to have him forcibly brought to the United States to spend time in coercive confinement) if anyone ever accuses me, openly or behind closed doors, of believing that a copyright infringement is automatically not fair use "simply because [he] used [my] content on [his] videos," or some reasonably similar variation thereof. After all, if someone continues to make that accusation against me, that is clearly evidence that Baz has failed in his injunction to convince everyone that this is not true, isn't it?

**V-5: Other Relief**

167.    I also ask for costs incurred to be reimbursed (including the fees needed to register the copyrights for all of these works), and also for any other relief that the Court believes I may be

entitled to.

## VI: CONCLUSION

168.    Wherefore, premises considered, I respectfully pray that judgment in my favor be granted, costs incurred be awarded and for any other relief to which I may be entitled.

So requested on this, the 29th day of February, 2024.


*/s/ David Stebbins*
David Stebbins (pro se)