David Stebbins (pro se Plaintiff)     123 W. Ridge Ave., APT D, Harrison, AR 72601
(870) 212-4947     acerthorn@yahoo.com

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

DAVID STEBBINS,                                                                                    PLAINTIFF

VS.                                        Case 3:24-cv-00398-LJC

THIAGO CHAGAS GARCIA BAZ                                                            DEFENDANTS

## RENEWED MOTION FOR ENTRY OF DEFAULT

Comes now, pro se Plaintiff David Stebbins, who hereby submits the following Renewed Motion for Entry of Default in the above-styled action.

### Incorporation of Previous Motions

1. For simplicity's sake, I hereby incorporate all my previous pleadings – including and especially the previous Motion for Entry of Default (Dkt 29) – by reference into this motion.

### No update has been received by the Brazilian Central Authority.

2. It is now April 22, 2025, the date when the Court said I may re-file my Motion for Entry of Default, and we still have not received any update from the Brazilian Central Authority.

3. Earlier this month, I contacted the Brazilian Central Authority via email to inquire about the matter. They replied and said that they had no new information for me. See **Exhibit A** and **Exhibit B**.

### I have served the Defendant with process via email as the Court suggested.

4. While the Court has decided that service by email is not a valid option in this case, it nevertheless gave me leave to do so, if only to ensure that all reasonable attempts to serve him have been exhausted. See Dkt. 30, Page 3 ("Stebbins may wish to serve Garcia Baz by email with the documents previously transmitted to the Central Authority and a copy of this Order, as an additional step beyond the service required by the Hague Convention, to demonstrate that all reasonable efforts have been taken to inform Garcia Baz of this lawsuit and of the possibility that the Court will proceed to enter default judgment if he does not appear").

5. I did exactly that on January 22, 2025. See **Exhibit C**. Therefore, while this by itself does

not constitute service, it nonetheless means that Mr. Baz was actually made aware of this lawsuit (assuming he hasn't already) and that I have exhausted all reasonable methods to serve him with process.

**A declaration from the United States is not required to enter the defendant in default.**

6. This Court has previously interpreted Article 15 of the Hague Convention ("Art. 15") to require that the country (in this case, the United States) must "declare" that its courts can enter a default judgment against a foreign defendant before the court can actually do so. See Dkt. 30. In its follow-up order, it authorized me to argue that such a declaration is in fact not required, as long as I support that argument with legal citation. See Dkt. 32.

7. When the plain text of a statute is not 100% clear and unambiguous, courts are supposed to turn to the canons of statutory construction to find the correct interpretation, such as "in pari materia" or "ejusdem generis."

8. To my knowledge, none of the canons I researched seem to support this court's proferred interpretation of Art. 15, that a country must declare her courts may enter default judgment before they can do so.

9. Of all the most common canons, the one that most supports my preferred interpretaiton (that a declaration from the United States is not required before the Court can enter a default judgment) is the doctrine of "reductio ad absurdum," which states that Courts should avoid interpretations of the law that would lead to manifestly absurd consequences, unless it is abundantly clear that the legislature (in this case, the UN) clearly understood those consequences and intended for them to occur. See Green v. Bock Laundry Machine Co., 490 U.S. 504 (1989). This canon is explicitly endorsed by the Vienna Convention on the Law of Treaties, which governs how international treaties (such as the Hague Convention) are to be interpreted. The text of the English version of this treaty can be found at the following URL:

https://legal.un.org/ilc/texts/instruments/english/conventions/1_1_1969.pdf

10. On Page 13, you can see that Article 32 of that treaty gives signatory countries discretion to employ "supplementary means of interpretation" when failing to do so "leads to a result which is manifestly absurd or unreasonable."

11. This is, admittedly, a high bar to clear. "In statutory interpretation, an absurdity is not mere oddity. The absurdity bar is high, as it should be. The result must be preposterous, one that no reasonable person could intend." See Texas Brine Co. LLC v. American Arbitration Association, 955 F.3d 482, 486 (2020). Moreover, the avoidance applies only when "it is quite impossible that Congress could have intended the result ... and where the alleged absurdity is so clear as to be obvious to most anyone." See Catskill Mountains Chapter of Trout Unlimited, Inc. v. United States EPA, 846 F.3d 492, 517 (2d Cir. 2017) (quoting Public Citizen v. U.S. Dept. of Justice, 491 U.S. 440, 470–71 (1989) (Kennedy, J., concurring in the judgment)). "[T]o justify a departure from the letter of the law upon that ground, the absurdity must be so gross as to shock the general moral or common sense." See Crooks v. Harrelson, 282 U.S. 55, 60 (1930).

12. In the instant case, the manifest absurdity that would result if this Court's proferred interpretation were accepted is that I would be left entirely without recourse. In any other case, where the defendant was an American, I would be eligible for service of process by the US Marshal because I am proceeding in forma pauperis. If the Marshal had shirked its duty to serve process on the defendant, the Court can simply hold the Marshal in contempt. Even if I were not eligible for service of process by the Marshal, and my first choice of process server refused to do his job, I could hire just about anyone to conduct service of process for me. See Fed.R.Civ.P. 4(c)(2) ("Any person who is at least 18 years old and not a party may serve a summons and complaint").

13. But here, it's the Brazilian Central Authority or no one. They are outside this Court's jurisdiction, so if they fail to do their jobs, the Court cannot force them to and I have no other options. At that point, my only remaining option is to seek default judgment.

14. So if the Court feels it cannot enter default judgment because some agent working for the US government never got around to giving that declaration, then what are my options then? Put simply, I would be screwed. I would be left without recourse, through no fault of my own, for a perfectly legitimate claim, simply because of a technicality.

15. This runs afoul of one of the judiciary's most sacred and bedrock principles: "Ubi jus ibi remedium," or "for every wrong, the law provides a remedy." For hundreds of years, courts from the USA and the UK have dedicated their lives to creating remedies where the law doesn't

already provide one, just so injured men can have some semblance of justice. The 1703 English case of Ashby v White (1703) 92 ER 126 (which predates the USA's secession from the British Empire and thus is incorporated into our several states' common laws) is often touted as the greatest and most succinct expression of this maxim. Said Chief Justice Sir John Holt: "It is a vain thing to imagine, there should be right without a remedy; for want of right and want of remedy are convertibles: if a statute gives a right, the common law will give remedy to maintain it; and where-ever there is injury, it imports a damage."

16. To deny any judgment at all to a plaintiff simply because the defendant either didn't show up or couldn't be served would effectively give the defendant an instant "get out of liability free" card that he could invoke without consequence, getting out of any/all accountability for his tortious behavior. So what if he violated the plaintiff's rights? He can avoid all liability through the simple expedient of thumbing his nose at the Court's authority! All torts – legal and equitable alike – become effectively unenforceable at that point, and the whole of civil litigation becomes an entirely toothless mockery of its former self.

17. If the Court disagrees with me, and finds that the absurdity doctrine does not, in fact, preclude its proferred interpretation, then it must explain either ...

    (a) How it is not manifestly absurd to effectively screw me out of a judgment I am rightfully entitled to on the merits with no recourse; or

    (b) What exactly my other recourse is, if I cannot get a default judgment without effective Hague service but I cannot compel the Brazilian Central Authority to act?

    (c) Alternatively, the Court may show proof that, as absurd as this result is, it was nonetheless the clear intent of the UN to create this manifestly unjust consequence (see the upcoming section for more details).

18. If the Court cannot explain either of those three things, then it must concede that its proferred interpretation of Art. 15 is barred by the absurdity doctrine and abandon it.

**Examining the way other countries conduct litigation sheds some light on the potential legislative intentions behind Art. 15's language.**

19. At this point, the Court may be thinking "It might be unfair to you, but what other mean-

ing could Art. 15 possibly have?" To answer this, we must turn to the doctrine of legislative intent. In the United States, it is generally considered the second most important canon of statutory construction, second only to the "plain text of the statute" canon.

20.     Of course, identifying legislative intent here is a bit trickier than in most cases, since the legislature in question is the UN, not Congress. This means that the representatives come from all over the world, not just the USA, and thus bring with them life experiences and social customs reflective of their parts of the world. This means that they will have understandings and worldviews that, from our American point of view, may seem entirely arbitrary. For example, when this Court is interpreting an Act of Congress, it may assume, even without knowing anything about the individual Congressmen who drafted it, that they (A) hold freedom of speech in high regard, (B) believe strongly in democracy, (C) are capitalists, or at the very least not all the way facist, so on and so forth. We assume these baseline assumptions about the authors of each statute because *they're American*. But for the UN, we have no right to assume that the treaty's authors had *any* sort of baseline values or worldviews of *any* kind, whether they be aligned with ours or not. So we must look elsewhere to find clues of legislative intent.

21.     So that begs the question: How do other countries typically handle cases where the Defendant doesn't appear? Well, a brief overview of each countries' policy on default judgments can be found here: https://www.dlapiperintelligence.com/litigation/insight/index.html?t=05-default-judgment. While most countries allow plaintiffs to seek default judgment, some of them do not. For example, in the countries of Chile, Italy, and Mexico, when a defendant doesn't appear in response to a lawsuit, they still require the plaintiff to prove his claim, whereas American default judgments typically accept as true all factual allegations in a complaint except the damages. Therefore, Chile's, Italy's, and Mexico's process for dealing with non-appearing defendants would probably be best described as an "ex parte trial" or "trial in absentia," rather than a "default judgment" as American jurists understand the concept.

22.     So from these examples, one might reasonably conclude that the authors of Art. 15 intended for that article to be interpreted thus: Signatory countries *can* enter default judgment even without service of process, but the treaty doesn't *compel* a country to do so if it is not otherwise

part of their legal practices. If, however, it is the law of the land (as it is in the United States) to enter default judgment as the preferred method of dealing with non-appearing defendants, then that country's pre-existing authorization to enter default judgment may be pursued as normal.

23. Applying that logic to the instant case, as this Court is surely aware, the United States may *disfavor* default judgment as a matter of public policy, but it is absolutely in the Court's back pocket as a means of avoiding the manifestly unjust result of a plaintiff being left without a remedy for his wrong.

24. Even in the cases of Chile, Italy, and Mexico, their policies for dealing with non-appearing litigants do not leave the plaintiff out in the cold with no remedy through no fault of his own. Sure, they still require the plaintiff to prove his case, but the plaintiff still gets his day in court. To do otherwise would obviously be patently unjust.

**Alternatively, the Court (or Clerk) could give itself the required declaration.**

25. If, in spite of all of this, the Court still insists that Art. 15 requires a country to declare that a court may enter a default judgment, then I see no good reason why this Court cannot simply give itself the declaration it feels it requires.

26. Think about it: Whenever the law expressly delegates enforcement power to a certain body, Courts generally accept that body's enforcement power. See Nixon v. United States, 506 U.S. 224 (1993) (express constitutional delegation of judgment power in impeachment proceedings to the Senate rendered the Senate's decision unreviewable by the judicial branch). But when there is no express delegation of enforcement power, the judiciary typically appoints itself the one who enforces it. See Marbury v. Madison, 5 US 137 (1803).

27. Here, the Hague Convention does not specify which officer of any signatory country is expected to issue this declaration. While I maintain that this is because such a declaration was never required to begin with, if the Court disagrees with me even after all the evidence to the contrary discussed above, the lack of an express delegation typically means that it is the judiciary's responsibility to do it.

28. For that matter, the Court's existing standard practices are probably already doing that! Think about it: When the defendant doesn't appear in court, I don't just go straight to filing a

Motion for Default Judgment. I must first file a Motion for *Entry of Default*. Once granted, this entry of default doesn't actually do anything on its own; instead, it just makes me eligible to file a Motion for Default Judgment, which is what I'm truly after.

29.     Let that sink in for a minute: The only thing that an entry of default actually does is... wait for it... *__declare__* that the Court may enter judgment by default! Gee, I wonder where I've heard that before!

30.     So even if the Court insists that a declaration from the United States is required under Art. 15, the Court and/or its Clerk can easily just give itself the declaration since nobody else is expected to.

## Conclusion

31.     Wherefore, premises considered, I respectfully pray that this Motion for Entry of Default be granted.

So requested on this, the 22nd day of April, 2025.

*/s/ David Stebbins*
David Stebbins (Pro se)
