David Stebbins (pro se Plaintiff)    123 W. Ridge Ave., APT D, Harrison, AR 72601
(870) 212-4947    acerthorn@yahoo.com

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

DAVID STEBBINS,                                          PLAINTIFF

VS.                          Case 3:24-cv-00398-LJC

THIAGO CHAGAS GARCIA BAZ                              DEFENDANTS

## MEMORANDUM IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT

Comes now, pro se Plaintiff David Stebbins, who hereby submits the following
Memorandum in Support of Motion for Default Judgment in the above-styled action.

## I: TABLE OF CONTENTS

| Section | Page |
|---|---|
| **I: TABLE OF CONTENTS** | i |
| **II: TABLE OF AUTHORITIES** | iii |
| **III: FACTS OF THE CASE** | 1 |
| **IV: SUMMARY OF ARGUMENT** | 1 |
| **V: ARGUMENT** | 2 |
| **V-1: Why default judgment should issue** | 2 |
| V-1-A: Factor #1: the possibility of prejudice to the plaintiff | 2 |
| V-1-B: Factor #2: the merits of the plaintiff's substantive claim | 2 |
| V-1-C: Factor #3: the sufficiency of the complaint | 6 |
| V-1-D: Factor #4: the sum of money at stake in the action | 7 |
| V-1-E: Factor #5: the possibility of a dispute concerning material facts | 7 |
| V-1-F: Factor #6: whether the default was due to excusable neglect | 8 |
| V-1-G: Factor #7: the strong policy favoring decisions on the merits. | 8 |
| V-1-H: Eitel test in conclusion | 9 |
| **V-2: Why the Court should award maximum statutory damages** | 9 |
| V-2-A: The commonality of this brand of infringement & the | |

sheer entitlement of those who commit it.                                          9

V-2-B: The wealth of the Defendant                                                12

V-2-C: The infringement was most likely intentional                               13

V-2-D: I'm especially susceptible to harm from copyright infringement,

much more so than most plaintiffs in copyright cases.                             14

V-2-E: My lack of resources, coupled with the fact that the defendant is

a foreign national, means I will need a large judgment in order to entice

judgment collection agencies to take the case on contingency.                      1

V-2-F: If actual damages are mandatory, the Court should award

"Trobaugh Damages" (for lack of a better term) of $800,300.                       16

**V-3: Other Relief Requested**                                                   18

**V-4: The Court should publish its judgment in the Federal Supplement.**          19

**VI: CONCLUSION**                                                                20

## II: TABLE OF AUTHORITIES

**Statutes & Rules**                                                              **Page(s)**

- 17 USC § 504                                                                    7,13,18

- 28 USC § 1915                                                                   7

- § 17.35 of the 9th Circuit Model Civil Jury Instructions                        passim

- Convention on the Service Abroad of Judicial and                                1
  Extrajudicial Documents in Civil or Commercial
  Matters ("The Hague Convention")

- Fed.R.Civ.P. 15                                                                 1

- Fed.R.Civ.P. 8                                                                  2,17

**Case Law**                                                                      **Page(s)**

- Chevron U.S.A., Inc. v. Natural Resources                                       16
  Defense Council, Inc., 467 U.S. 837 (1984)

- Eitel v. McCool, 782 F.2d 1470 (9th Cir. 1986)                                  passim

- FW Woolworth Co. v. Contemporary Arts, Inc., 344 US 228 (1952)                  10

- Hazle v. Crofoot, 727 F. 3d 983 (9th Cir. 2013)                                 16

- Hustler Magazine v. Moral Majority, 796 F. 2d 1148 (9th Cir. 1986)              2

- In re Aimster copyright litigation, 334 F. 3d 643 (7th Cir. 2003)              14

- Loper Bright Enterprises v. Raimondo, 144 S. Ct. 2244 (2024)                    16

- Trobaugh v. Hall, 176 F. 3d 1087 (8th Cir. 1999)                                passim

- Washington Shoe Co. v AZ Sporting Goods,                                        13
  704 F. 3d 668 (9th Cir. 2012)

## III: FACTS OF THE CASE

1.      On January 10, 2024, I filed this pro se lawsuit against Thiago Baz for copyright infringement, alleging libel, DMCA misrepresentation, and fourteen (14) counts of copyright infringement. See Dkt. 1. The libel and misrepresentation claims were struck, but the copyright infringement claims were allowed to proceed. See Dkt. 3. On February 29, 2024, I filed my First Amended Complaint, pursuant to my rights under Fed.R.Civ.P. 15(a), alleging an addition seven (7) counts of copyright infringement, for a total of twenty-one (21) counts of infringement in total. See Dkt. 8.

2.      For the sake of keeping this motion brief, the contents of Dkt. 8, including all factual allegations, are hereby incorporated by reference.

3.      The Court and I came up with a plan to serve the defendant with process pursuant to the Hague Convention. See Dkt. 22. On August 2, 2024, I contacted Thiago Baz on Discord using an alt account, so he didn't know it was me. During this conversation, he admitted that he had no intention of appearing in this case, and that he planned to simply let me have a default judgment. See **Exhibit A** and **Exhibit B**.

4.      I am writing this Motion for Default Judgment well in advance, so I do not know if he was served with process under the Hague Convention, served via email, or if the Court simply entered him in default on its own pursuant to Art. 15, ¶ 2 of the Hague Convention. Regardless of how it happened, if the Court is seeing this motion at all, that means the Defendant has been entered in default.

5.      This means that the case is now ripe for default judgment.

## IV: SUMMARY OF ARGUMENT

6.      Five of the seven Eitel factors favor entering default judgment in this case, so the Court should enter default judgment.

7.      The six factors for statutory damages set forth by § 17.35 of the 9th Circuit Model Civil Jury Instructions are not unanimously in my favor, but they overwhelmingly are. In addition, a multitude of additional factors make up for the few enumerated factors that don't favor me. As such, the Court should award maximum statutory damages in my favor.

## V: ARGUMENT

8.    For the reasons set forth below, the Court should grant this motion for default judgment and award maximum statutory damages of $3,150,000 in the above-styled action.

### V-1: Why Default Judgment Should Issue

9.    The binding precedent of Eitel v. McCool, 782 F.2d 1470 (9th Cir. 1986) sets forth seven factors the Court should consider when deciding whether to enter a default judgment. Those seven factors are (1) the possibility of prejudice to the plaintiff; (2) the merits of the plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. See id at 1471-72.

10.    I will address each of these factors in turn. While I address each factor, please keep in mind that all material facts are considered admitted to, except the extent of damages. See Fed.R.Civ.P. 8(b)(6).

### V-1-A: Factor #1: the possibility of prejudice to the plaintiff

11.    If I do not get a default judgment in this case, the circulation of my copyrighted work will almost certainly continue. Not only that, but it would embolden other people to pay the fees to access my paywalled videos and repost them for free, since they would now have precedent that they will not be held liable as long as they just ignore the lawsuits filed against them. Therefore, I do indeed stand to be heavily prejudiced if judgment is not entered in my favor.

### V-1-B: Factor #2: the merits of the plaintiff's substantive claim

12.    "There are only two elements necessary to the plaintiff's case in an infringement action: ownership of the copyright by the plaintiff and copying by the defendant." See Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F. 2d 1148, 1151 (9th Cir. 1986).

13.    Here, both elements of prima facie copyright infringement have been handily satisfied, to the point where even the Defendant himself admits in writing to these two elements. In his DMCA Counter-Notification (see **Exhibit C**), the Defendant says in pertinent part "Fair Use dictates that criticism is one of the factors that may determine if one can use someone else's

intellectual property without the author's consent," thereby effectively admitting that he did, indeed, use my intellectual property (my videos, icon, and music) without my consent. He also said "The [Plaintiff] seems to have erroneously assumed that it wasn't fair use simply because I used his content on my videos," thereby effectively admitting that he did, indeed, use my content in his videos.

14.     Fair use is the only affirmative defense that the defendant has even remotely suggested he intended to use, and so that is the only one that needs to be even nominally considered here.

15.     I do not believe fair use needs to be considered at all, since the Defendant never appeared in this case and, therefore, obviously never raised and preserved the defense. Since the defense is not officially before the Court, the Court need not consider it. If the Court agrees with this logic, it may choose to skip reading the rest of this section and move onto Section V-1-C (sufficiency of the complaint).

16.     However, the Defendant did raise the defense of fair use in his DMCA Counter-Notification. As a novel theory of law, one could argue that this should be considered to be quasi legal proceedings and, therefore, may have the effect of putting the defense before the Court for purposes of default judgment[1]. To that end, I will nominally address fair use here. For simplicity's sake, the arguments and legal citations contained in Dkt. 8, ¶¶ 112-138 are hereby incorporated by reference.

17.     In order to elaborate on the matter of fair use, I will only use the three-part Second Stormcloaks Response, as that one trilogy of videos is a fair representation of all 15 videos he posted that infringed on my copyright. If I were to analyze all 15, this Memorandum would be over 50 pages long and would contain numerous repetitive observations.

18.     As I said in my First Amended Complaint, I reposted the infringing videos to my own YouTube channel as unlisted videos. See Dkt. 8, ¶ 47. The three videos I intend to analyze in this motion can be found at the following URLs:

- Part 1: https://www.youtube.com/watch?v=8IBIpFmTwCU
- Part 2: https://www.youtube.com/watch?v=wC_dzCgW5jg

---

1   I propose that the Court reserve for a later date the question of whether this defense is still so preserved if the Defendant appears in the case but doesn't raise the defense in his Answer.

● Part 3: https://www.youtube.com/watch?v=j9p9dK99sEw

19.     In addition to these videos themselves, if you look in the descriptions of each of them, you will find a link to a "playlist of clips." This playlist takes the corresponding videos and chops them up into clips, with each clip being exclusively one of two things: Either he is copying my videos or he is providing his own original narration. He never does both at the same time; whenever he gives criticism, he always pauses my video to do so.

20.     In all three parts he managed to post before his channel was terminated, he played all ten of the copyrighted songs that I used as background footage for the Stormcloaks video.

21.     Although the Defendant provides *some* criticism (not really extensive or thorough criticism, but criticism nonetheless), he copies far more of the Stormcloaks video than what is actually necessary for him to make this criticism. At multiple points in his response, he plays several minutes worth of the Second Stormcloaks video uninterrupted, only occasionally stopping to make rebuttal arguments. Entire sections of the Second Stormcloaks video would be played in their entirety without him stopping once to give even a single sentence of criticism. For example, in Part 1, timestamp 27:00 – 29:23 and again at timestamp 37:46 – 39:32 (Clips 26 and 38, respectively, in the playlist of clips), my "Undisputed Facts" #1, #2, #7, #8, and #9, as well as the prologue and epilogue to the entire "Undisputed Facts" chapter of the video, were all played in their entirety without the Defendant stopping once to give even a single sentence of criticism!

22.     Even in sections where he stopped occasionally to provide criticism, he still copied much more of my video than was necessary to make his criticism. For example, in Part 2, at timestamp 3:41 – 8:14 (or Clip 04 in the playlist of clips), there is a *four minute and 33 second stretch* of my video being played without interruption before he finally stops to make a comment! The criticism he then proceeds to give is only relevant to the eight seconds immediately before he paused. This means that there was a total of 4 minutes and 25 seconds of my footage that he could have removed from his response video (because it had no bearing on any of the criticism he was providing) and he just didn't.

23.     I will occasionally play my copyrighted songs on a loop. Since I own the copyright to these songs, I can legally do that, no fair use necessary. However, that, in combination with the

Defendant's aforementioned propensity for playing long stretches of my original video without pausing, means that the Defendant, at some points, will play literally *more than 100%* of the corresponding songs without stopping to give criticism once.

24.     One such example comes in Part 3 of his Second Stormcloaks Response, at timestamp 10:26 – 13:35 (Clip 12 in the playlist of clips), where he played a 3 minute and 8 second stretch without interruption. The music being played in that clip was "There is No Hope," which, as the Court can see from the playlist provided in ¶ 29 of the First Amended Complaint (Dkt. 8), is 2 minutes 46 seconds long. Therefore, the Defendant effectively played *more than one hundred percent* of "There is No Hope" without stopping to give criticism once! Two more examples come later in Part 3 of his series, at timestamps 34:35 – 36:56 and 39:54 – 41:54 (Clips 36 & 42, respectively, in the playlist of clips), he played stretches of 2 minutes 21 seconds and 2 minutes and half of one second of my original video. In both of those clips, the background music being played was "Blinding Rage," which is only 1 minute 56 seconds long. This means that, on two separate occasions, the Defendant played *more than one hundred percent* of "Blinding Rage" without stopping to give criticism once!

25.     In the rare event he does provide criticism or commentary, said commentary is the very definition of "threadbare." For example, in Second Stormcloaks Response Part 2, timestamp 15:40 – 15:43 (Clip 15 in the playlist of clips), all he does is exclaim in frustration but provides no real insight or commentary of any kind. Alternatively, in Second Stormcloaks Response Part 1, timestamp 21:42 – 21:51 (Clip 23 of the playlist of clips), the Defendant provides only nine seconds of original commentary which serves as his entire response to the entirety of the "Rule #5" section of the original video. Not only is his alleged "transformative" value extremely short, all he does is point out a factual oversight of mine that even he admits is a "small detail."

26.     At 2:33 of Part 1, he says he will only debunk about 20 minutes of my video at a time, and at timestamp 39:52 of Part 1, he admits that there is "still plenty to come." In other words, by the time he finishes this series (if he is allowed to finish it), he will have copied the entirety of my Stormcloaks video, literally every single second of it, while only responding to and criticizing a very small portion of it. He was not able to finish the series before I had his channel

terminated, but he has made it clear that this is what he planned to do.

27.     Of course, as the Defendant is sure to bring up, he didn't technically play "all" of the original Second Stormcloaks Video. There was one portion of the video he actually removed, but rather than bolster his case for fair use, it arguably makes his case far worse. Specifically, I am referring to Part 3 of his Second Stormcloaks Response, timestamp 26:41 – 26:57 (Clips 20 & 21 in the playlist of clips) where the defendant plays only six seconds of a segment in my original video where I ask viewers to consider supporting me through donations, such as Patreon, channel memberships, super chats, super thanks, etc. This segment can be found at timestamp 1:10:01 – 1:15:34 of the original video. The Defendant, however, declined to play this segment, on the grounds that he considered it to be "money-grabbing."

28.     Let's think about that for a minute: He feels *entitled* to play 100% of my video, thereby creating a market substitute, but the one part of the video he chooses not to play is the one part of the video that might actually confer me some benefit even if people don't go to my channel to see it! In other words, he is actively trying to sabotage my ability to profit off of my videos! He doesn't think I should be allowed to make any money off of my videos, not even through purely voluntary donations!

29.     Because the Defendant provided only nominal criticism, that criticism was few and far between, and because he ultimately copied way more of my video that he even arguably needed in order to make his criticism, the defense for fair use is an extremely weak one unless he wants to make an appearance in the case and bolster his case for fair use with additional evidence and arguments. Even if he were to make an appearance, Exhibit B (and, specifically, the sections that are boxed in red) show that he is likely not going to offer any truly revolutionary arguments, but instead will most likely just double down and insist that this nominal criticism is legally all he needs to automatically get fair use to the exclusion of all other factors.

30.     Contrary to common misconception, fair use requires much more than merely giving criticism, and copying all or nearly all of someone else's work while providing little more than exclamations, layperson opinions, and the pointing out of minor factual inaccuracies is actually a very weak case for fair use. And in a case like htis one, where the Defendant played long

stretches of the original without doing even that much, this already weak case for fair use becomes weak to an absurd degree.

31.      For all of these reasons and more, the second Eitel factor weighs in my favor.

### V-1-C: Factor #3: the sufficiency of the complaint

32.      This factor appears to be redundant of the § 1915 review that the Court is already supposed to conduct in this case because I am proceeding in forma pauperis. This factor might be more relevant in a case where the Plaintiff has paid the filing fee, thus bypassing that initial review. But in this case, I will assume that the Court has already screened the complaint for sufficiency, pursuant to 28 USC § 1915(e) and determined that I have sufficiently stated a claim upon which relief can be granted.

### V-1-D: Factor #4: the sum of money at stake in the action

33.      I am requesting statutory damages totaling $3,150,000. That is indeed a substantial sum of money. However, we must also remember that statutory damages can be as low as $750 per infringed work. See 17 USC § 504(c). Because I am suing for 21 counts of copyright infringement, that means the Court could conceivably award as little as $15,750 in this action.

34.      Therefore, I believe this factor to be neutral. The range of damages can both weigh in favor and weigh against default judgment in this case.

### V-1-E: Factor #5: the possibility of a dispute concerning material facts

35.      There is very little possibility for a dispute concerning material facts. As I mentioned earlier, prima facie copyright infringement is established by the Defendant's own admission, so there is no possibility of dispute there. Regarding the defense of fair use, we must remember that I backed up 14 of the 15 videos that I am suing over today, so the Court can see the bare minimum transformative value, as well as the fact that he copied all or nearly all of my videos to make his bare minimum criticism, with its own two eyes.

36.      The sole outlier to this is Part 4 of the Defendant's "First Stormcloaks Response" videos. As I explained in Dkt. 8, ¶ 60, Part 4 of that series is the one video I wasn't able to back up before it got taken down. However, the odds that the first three parts of this series are extremely weak cases for fair use, but that Part 4 will somehow be the magical ingredient that ties it all

together, brings the entire 4-part series full circle, and creates a surprisingly strong, come-from-behind case for fair use? Well, that isn't impossible, per se, but the odds of that happening are one in a million. If that alone were enough to defeat default judgment, no default judgment could ever be entered.

37.    But even in the already astronomically unlikely event that the Defendant could pull a rabbit out of a hat once Part 4 was subpoenaed from YouTube, that would only save him from liability for *one count* of infringement: That of the First Stormcloaks Video, described in Dkt. 8, ¶¶ 10-13 and later at ¶¶ 60-62 of same. That still leaves *twenty* counts of infringement – aka $15,000 - $3,000,000 in statutory damages worth of infringements – still before the Court which I did indeed manage to back up in full, and therefore, the Court can see the relevant facts with its own two eyes.

38.    Rather, even if the Defendant were to appear in the case, it seems that the only disputes he would raise would be ones of law, not fact. For example, in Exhibit B, in the sections of that conversation that are boxed in red, he doubles down in his insistence that it doesn't matter how much of the original he leaves in, as long as the content he adds has minimum creative spark.

39.    That, however, is a dispute of law, not fact, meaning it would just be disposed of on the motions anyway. Therefore, the fifth Eitel factor weighs in my favor.

V-1-F: Factor #6: whether the default was due to excusable neglect

40.    This is one factor that weighs so definitively in my favor, it likely makes up for any shortcomings in any of the other factors.

41.    As I explained above, and as Exhibit B demonstrates, his default in this case is not only not due to excusable neglect, but was in fact a calculated, conscious choice by him. He arrogantly believes that the Brazilian government will not enforce this judgment as long as he doesn't appear in the case. See Exhibit B, in the sections that are boxed in blue. Whether that is true or not remains to be seen, but for the time being, the Court should treat his default precisely as he described it: A willful and intentional decision to thumb his nose at the Court's authority, rather than excusable neglect.

<u>V-1-G: Factor #7: the strong policy favoring decisions on the merits.</u>

42.    This is the one factor that seemingly weighs against default judgment (unlike Factor #4, which I believe to be neutral). However, that is only because this factor *always* weighs against default judgment. If this one factor singlehandedly killed my motion for default judgment, no motion for default judgment could ever be entered in any proceeding. Because of this, this factor should be treated as the least important of the seven Eitel factors.

43.    However, for what it's worth, this case does have at least one mitigating factor that most other motions for default judgment do not have: I backed up 14 of the 15 infringing videos, and so the Court can see most of the infringement with its own two eyes. As a result, the Court can still, at least sort of, decide the case on the merits. It's not an ideal situation, but then again, I reiterate that it was the Defendant's conscious and intentional choice to put us in this position. As such, he should be the one to have to deal with the consequences thereof, not me.

44.    These three mitigating factors (the lack of weight given to this factor even in the best case scenario, the preservation of the infringements, and the Defendant's willful and malicious intent in causing this default) should all cause this factor to be at least neutral, if not overall weigh in my favor.

<u>V-1-H: Eitel test in conclusion</u>

45.    In conclusion, five of the seven Eitel factors weigh definitively in favor of granting default judgment, while two of them being arguably neutral. In conclusion, default judgment is appropriate.

**V-2: Why the Court should award maximum statutory damages**

46.    For the following reasons, the Court should award maximum statutory damages of $150,000 per count of infringement, for a grand total of $3,150,000.

47.    Section 17.35 of the 9th Circuit Model Civil Jury Instructions gives six factors that juries are encouraged to consider when awarding statutory damages: (1) the revenue lost by the copyright holder as a result of the infringement; (2) the profits earned by the defendant as a result of the infringement; (3) the need to deter future infringement; (4) the need to penalize the infringer; (5) the circumstances of the infringement; and (6) whether the infringement was

intentional.

48.    However, although juries are *encouraged* to consider these factors, they are not the only

factors that can legally be considered. In fact, in the case of FW Woolworth Co. v. Contemporary

Arts, Inc., 344 US 228, 234 (1952), the Supreme Court empowered district courts to consider "all

facts" when deciding statutory damages.

49.    In light of this, here are all the reasons why this Court should award me as much statutory

damages as possible:

<u>V-2-A: The commonality of this brand of infringement & the sheer
entitlement of those who commit it.</u>

50.    The consideration of this factor is sanctioned by the 9th Circuit's Model Civil Jury

Instructions, which encourage juries to consider "the need to deter further infringement" when

calculating statutory damages.

51.    In case in this Court is not an avid watcher of YouTube videos, it should know that this

brand of infringement is extremely common on social media. By "this brand," I mean full-length

reaction videos, where the secondary user plays 100% or nearly 100% of the original video while

providing minimal commentary. Often, their "reactions" are them recording themselves watching

the original videos for the first time, and therefore, they have no idea what parts of the video

need criticism and which don't. As famous lawyer turned YouTuber Devin "LegalEagle" Stone

explains in at timestamp 22:32 – 23:01 of this video: https://youtu.be/um9aGTAU0lg?t=1352

> "[I]t might actually be impossible for any livestreamer to have a livestream
> reaction where they're just simply playing the entire video and reacting [and still
> have it be fair use], because there's been no forethought about what's the
> minimum necessary to make the point of the commentary or the point of the
> criticism. And courts don't look fondly when you use the entirety of the work."

52.    This sort of reaction is *extremely* common on video-based social medias like YouTube

and TikTok. For example, here is one video dated from 2016 (which was years before I even

started making YouTube videos myself) which demonstrates how much of an epidemic this

brand of infringement was even back then: https://www.youtube.com/watch?v=vjXNvLDkDTA.

Beginning at timestamp 20:21 – 22:38 of that video, he conducts his own fair use analysis,

making many of the same observations that I made in this case, such as how the reactors play

100% of the original videos they react to.

53.     That video is nearly nine years old (as of the time of this writing; by the time this Court gets around to ruling on this motion, it will almost certainly have had its ninth birthday), and attached to this motion is **Exhibit D**, a compilation of some of the highest-rated comments on that video that show just how relevant this rant is all these years later.

54.     It's astonishing how commonplace this practice is, but what is perhaps even more astonishing is the levels of sheer entitlement displayed by those who do it. As I've already shown numerous times this case, defendant Thiago Baz arrogantly and vulgarly insists that his videos are "still fair use you dickhead," but his attitude is merely the tip o the iceberg. Anyone who gets their reactions taken down, no matter how weak their cases are for fair use, almost inevitably cry out into the ether, claiming "censorship" or "silencing of criticism." For example, back in late 2019 and early 2020, a reaction channel called MXR Plays accused copyright holder Jukin Media of extortion – a literal crime – simply because Jukin sought to enforce its copyright which MXR was infringing upon in a manner that is just as weak of a case for fair use as Thiago Baz's videos here. Legal Eagle also made a video discussing both the copyright infringement and the extortion attempts: https://www.youtube.com/watch?v=5A_i-sB9H0Q. As you can see from that video, the sheer entitlement of MXR Plays (that they feel entitled to do these reactions, act like it's already a foregone conclusion that they are fair use, and act like Jukin Media is *literally extorting them* by disagreeing with their status as fair use, even though Jukin was legally in the right) has to be seen to be believed.

55.     Then we have the critically acclaimed documentary "YouTube's copyright system isn't broken. The world's is" by Tom Scott: https://www.youtube.com/watch?v=1Jwo5qc78QU. Throughout this video, he repeatedly acknowledges the scope of entitlement that persists throughout Internet culture, including ...

- Timestamp 11:10 – 11:37

    "[T]he worst case scenario was that I'd get a cease-and-desist letter. And if that happened, I might be able to cry 'censorship' and get some publicity out of it. I've grown up since then, but there are a whole new wave of kids who have that same philosophy."

- Timestamp 18:52 – 18:59

  "[T]hey've seen the backlash that happens when horrible gamer children are suddenly denied something they think is their right."

- Timestamp 27:27 – 27:50

  "A lot of folks, particularly younger people ... think that they have the right to upload long compilations of their favorite videos, with maybe a few words spoken between each clip, and make loads of money from it, that that is something that they are *entitled* to do, and that any copyright owners who complain are censoring them and putting in false claims."

56.     In light of how commonplace this practice is, and how entitled the people who do it are, the Court has a vested interest in stamping this practice out. As I said earlier, the consideration of this factor is sanctioned by the 9th Circuit's Model Civil Jury Instructions, which encourage juries to consider "the need to deter further infringement" when calculating statutory damages. To do that, the Court needs to make an example out of the few and far between[2] cases of this type that actually do come onto its docket, and that means awarding massive statutory damages.

<u>V-2-B: The wealth of the Defendant</u>

57.     The Model Civil Jury Instructions contemplate this factor when it encourages juries and judges to consider "the need to penalize the infringer."

58.     Another factor justifying increased statutory damages is how financially well off the defendant is. For example, when Donald Trump was held in contempt of court for refusing to comply with E Jean Carroll's discovery, he was fined a whopping $10,000 per day. See https://www.cnn.com/2022/04/26/politics/trump-contempt-fine/index.html. The *reason* he was fined so much is obvious: Because as wealthy as he is, he *needs* to be fined that much in order for the fines to have any legitimate coercive effect.

59.     In the instant case, the Defendant likewise comes from a wealthy family. As the Court can see from Exhibit B, in the section that is boxed in green, he admits that he is in the upper middle class in Brazil, enough that he doesn't have to worry about finding gainful employment.

---

2     "Few and far between" because, while this practice is quite common, it's rare for a case of this type to actually make it all the way to court, as the vast majority of defendants who get caught doing this will quickly settle out of court once they finally get around to hiring a lawyer, who then explains to them how fair use *actually* works..

In November[3] of 2023, he released his masters thesis in veterinary science which earned him his degree from Sao Judas Universidade (Translation: "St. Judas University"). See **Exhibit E**[4]. He admitted in Exhibit B that he got his veterinarian license immediately thereafter, and has recently secured a job at a veterinary clinic, en route to becoming a veterinarian himself in the future.

60.     Therefore, just like with Donald Trump above, the Defendant needs to have a massive amount of damages issued against him in order for him to properly feel its sting.

<u>V-2-C: The infringement was most likely intentional</u>

61.     The Model Civil Jury Instructions expressly contemplate "whether the infringement was intentional" as a factor to be considered when calculating statutory damages. Washington Shoe Co. v. AZ Sporting Goods Inc., 704 F. 3d 668 (9th Cir. 2012) provides the leading case law in the Ninth Circuit on this issue.

62.     In Exhibit B, in the sections that are boxed in red, the Defendant doubles down on his insistence that fair use requires little more than minimum creative spark. Of course, this is false, but he appears to sincerely believe it. At the very least, I cannot prove that his belief isn't sincere.

63.     However, that's not the only way to prove intent. The Ninth Circuit Court of Appeals has held that, when calculating statutory damages under 17 USC § 504(c)(2), ...

> "[A] finding of willfulness in the copyright context can be based on either inten-
> tional behavior, **_or merely reckless behavior_**, and that to prove willfulness under
> the Copyright Act, the plaintiff must show (1) that the defendant was actually
> aware of the infringing activity, **_or (2)_** that the defendant's actions were the result
> of reckless disregard for, or willful blindness to, the copyright holder's rights."
> See Washington Shoe Co., supra at 674 (emphasis added; citations and quotations
> omitted).

64.     Applying that legal standard to the instant case, it is clear that Baz's actions fall squarely within the standard of "reckless disregard or willful blindness to" my legal rights. He insists that the mere fact that he provided criticism is alone enough to constitute fair use to the exclusion of all other factors? Well, never once does he provide anything remotely resembling and empirical source, let alone a legally-binding statute or case law, to back up this outlandish claim.

---

3    Sao Paulo, Brazil is located south of the equator, so his seasons are flipped compared to ours. So November is the end of the spring semester for him, and December/January is the equivalent to June/July in the USA.

4    You can download a copy of this thesis at the URL of https://repositorio.animaeducacao.com.br/items/6042c051-7594-456d-b28f-db6080c02288.

65.    In fact, there is a multitude of empirical sources that repeatedly shoot down Baz's widely believed, but blatantly false, belief about how fair use works. For example, when disputing a copyright claim on YouTube (which I assume Baz must have done at least a few times in his time making YouTube videos, as that is simply an inevitability that we all eventually have to do it), YouTube themselves state outright that "[t]here's no magic formula to determine whether you're protected by an exception to copyright, such as fair use." See **Exhibit F**. Nearly every tutorial on YouTube, and nearly every tutorial that shows up in a simple google search about fair use, clearly says that fair use is a balancing test of four different factors. There is not one single solitary empirical source anywhere that affirms Baz's belief that "criticism = fair use, full stop."

66.    So either (A) Baz never actually bothered to do even the most rudimentary of fact checking before vulgarly insisting that his videos were "still fair use you dickhead," or (B) he did indeed fact check it, found empirical sources that clearly debunked his previous beliefs, but then made the conscious choice to espouse those beliefs anyway, knowing them to be false. Either one would easily satisfy the legal standard for recklessness or willful blindness.

67.    Therefore, the infringement was most likely intentional, which, according to the Ninth Circuit's model civil jury instructions, is a factor that weighs in favor of increased statutory damages.

<u>V-2-D: I'm especially susceptible to harm from copyright infringement, much more so than most plaintiffs in copyright cases.</u>

68.    This consideration is contemplated by the Model Civil Jury Instructions when it encourages juries and courts to consider "the circumstances of the infringement."

69.    Copyright law is often scoffed at by the younger generation. See In re Aimster copyright litigation, 334 F. 3d 643, 645 (7th Cir. 2003) ("The swappers, who are ... disdainful of copyright and in any event discount the likelihood of being sued or prosecuted for copyright infringement"). However, a major reason for why that is is because the most common plaintiffs in copyright infringement cases are millionaire artists – possibly even multi-billion-dollar multinational corporations – who have already made millions and millions of dollars off of their respective intellectual property, and who are simply hoarding the IP just out of pure greed. Below are just a few examples of the way most people perceive millionaire artists vigorously enforcing copyright:

- https://www.youtube.com/clip/Ugkx0cQM7Yy0ln7n4hREr65nKNtENWkITIyA

- https://www.youtube.com/clip/UgkxPfxYAm4OFSmm2XXaMc88SPGpZKZeOvZa

70.     However, I am light years away from that stereotype. As this Court can clearly see from Dkt. 2, I am very poor. For me, every sale is precious, and copyright infringement in my case really does represent the difference between poverty and financial security, not merely wealth vs super duper wealth.

71.     For this reason, the Court should treat these acts of infringement as more serious, and award more statutory damages, than the same infringement under otherwise identical circumstances inflicted on a multi-millionaire musician or a AAA Hollywood studio.

> V-2-E: My lack of resources, coupled with the fact that the defendant is a foreign national, means I will need a large judgment in order to entice judgment collection agencies to take the case on contingency.

72.     The Model Jury Instructions contemplates this factor when it encourages juries and courts to consider "the circumstances of the infringement."

73.     I have very limited resources and am proceeding in forma pauperis. See Dkt. 2. In addition, the Defendant is a foreign national, and has even admitted in writing that he plans to exploit the logistical difficulties in enforcing an international judgment abroad. See Exhibit B, the sections boxed in yellow.

74.     Because of my indigence, I am unable to pay upfront for a collections agency to collect on the judgment, even if the defendant had domestic assets (which he most certainly does not). Instead, I will have to offer them a percentage of the money they collect from the Defendant to entice them to take the case. Because the Defendant is a foreign national, the percentage of the judgment that I will have to offer them is going to go way up. For example, this collections agency ... https://www.kaplancollectionagency.com/ratecontract/ ... typically charges a whopping 30% for debtors located outside the USA, which is the highest percentage they take for any judgment, and they brag that their contingency rates are "extremely competitive."

75.     To make up for this, the Court should award me massive statutory damages, so that, even after the collection agency takes a solid third of the money as compensation for enforcing the judgment on Brazilian soil, I would still be left with a sizeable amount of money to compensate

me for the lost views suffered as a result of his infringement, as well as all the time and effort I expended litigating this case. Statutory damages of $3,150,000 (the maximum allowed) would certainly do that.

### V-2-F: If actual damages are mandatory, the Court should award "Trobaugh Damages" (for lack of a better term) of $800,300.

76.     As I explained in ¶¶ 153-156 of the First Amended Complaint (Dkt. 8), I am eligible to recover statutory damages on all 21 copyrights because the works are all unpublished. As I explain in the FAC, because they are all unpublished, "I can apply for registration of those works whenever I want, and I would still be eligible for statutory damages. After all, any registration date is necessarily 'within three months after the first publication' if *there is no first publication!*" (emphasis in original).

77.     Since filing that FAC, the Supreme Court has overturned the case of Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). See Loper Bright Enterprises v. Raimondo, 144 S. Ct. 2244 (2024). So this Court is no longer as bound by Circular 66 as it as when I first filed this lawsuit. As such, the Court may conclude that the works are all published, and therefore, I can only recover statutory damages for the ten songs (as they are the ones where the registration predates the infringement).

78.     In the event that the Court so holds this, and therefore decides that I am limited to recovering actual damages for the other eleven copyrights (the ten videos that don't have my copyrighted music in them, as well as my old channel icon), then I wish to invoke the 8th Circuit precedent of Trobaugh v. Hall, 176 F. 3d 1087 (8th Cir. 1999). This precedent was used by the 9th Circuit Court of Appeals to overturn the district court's judgment in the case of Hazle v. Crofoot, 727 F. 3d 983, 993 (9th Cir. 2013), so it is still binding in the 9th Circuit.

79.     In that prison segregation case, Plaintiff Charles Trobaugh was awarded only $1 in nominal damages when the district court found that the Defendants had unconstitutionally put him in solitary confinement for three days in retaliation for exercising his First Amendment right to file prison grievances. The 8th Circuit Court of Appeals affirmed the finding of liability, but overturned the award of nominal damages, finding that, when ...

(a)     the tortuous act is considered harmful per se,

(b)    the exact economic value of the injury is difficult to calculate with precision, and

(c)    the tortuous behavior (and, therefore, the harm) was kept up perpetually over a period of multiple days,

80.    ... then the district court should award compensatory damages of approximately $100 for every day the tortuous behavior was kept up. See id at 1088-89. This was purely an award of compensatory damages; the Court of Appeals directed the district court to also award punitive damages on top of that. See id at 1089 ("Further, we ask the District Court to reconsider awarding punitive damages against Hall").

81.    For purposes of this case, I will refer to these "$100 per day of tortuous conduct" damages as "Trobaugh Damages" for simplicity's sake.

82.    Applying this precedent to the instant case, all we need to do is find out how many days each infringing video and/or infringing series was published, and we can then calculate the Trobaugh damages from there. For this analysis, I will be omitting the Second Stormcloaks video (¶¶ 36-38 of FAC) and the ten copyrighted songs (¶¶ 27-35 of FAC), as well as his three-part "Second Stormcloaks Response" series (¶¶ 75-82 of FAC), as I am still eligible for statutory damages for those copyrights regardless of whether they are published or not, since the copyright registration for those ten songs predates the Defendant's infringement thereof.

83.    As a blanket statement, the infringements all ended on August 24, 2023, as that is the date that the Defendant incurred his third copyright strike, causing his channel to be banned[5]. Of the fifteen infringing videos I am suing over today, the three-part "Second Stormcloaks Response" series are the only videos that were taken down before that date, and I am omitting those from this discussion for reasons already explained.

84.    So from there, we just need to determine the dates in which the other twelve videos were first posted on YouTube by the Defendant. To that end, we must remember that, because the Defendant has been entered in default, all factual allegations made in the complaint, except those that directly relate to damages, are admitted by default, pursuant to Fed.R.Civ.P. 8(b)(6). In ¶ 53,

---

5    Although his channel was unbanned for the duration of this case, he removed of his own accord all videos that hadn't been taken down via a DMCA Takedown Notice less than 24 hours after his channel was temporarily unbanned. Therefore, that period where the infringements recommenced provides a negligible contribution to the Trobaugh damages and therefore does not need to be considered.

¶ 60, ¶ 63, ¶ 69, ¶ 73, and ¶ 84 of the First Amended Complaint, I alleged the dates in which each of these infringing videos and series were posted to YouTube. While I am using these dates to calculate the Trobaugh Damages, they are not "directly" related to the amount of damages, so I believe they are still admitted to because of the Defendant's failure to deny them.

85.    In the event the District Court insists that these dates are not admitted to, then please find attached **Exhibit G**, a compilation of screenshots of the watch pages for all twelve infringements for which I am arguably not entitled to recover statutory damages. These screenshots also show the dates in which they were first published, thereby proving the dates alleged in the First Amended Complaint.

86.    Using these dates as the dates when Trobaugh Damages began to accumulate (for infringements which were split into multiple parts, such as the Civility Response or the First Stormcloaks Response, I used the date that the final episode in those series were uploaded), and using August 24, 2023 as the date when the infringements ceased, I was able to calculate that all eleven of my copyrighted works were infringed upon for between 406 and 1,587 days. Calculating damages of $100 per day, per original copyrighted work, we get a grand total of $800,300 in Trobaugh damages. See **Exhibit H**. I also posted this spreadsheet in Google Sheets, so the Court can even see the equations I used to calculate these damages by hovering over the cells. You can see the spreadsheet for yourself by going to the following URL:

docs.google.com/spreadsheets/d/1vmMdx6tdc1m64XIzkIQ1cBAnaGInmYDf9tn_8nHnBDA

87.    So for reasons already explained in the above sections, the Court should award me statutory damages of $3,150,000 for all twenty-one counts of copyright infringement, or in the alternative $1,500,000 in statutory damages for the ten copyrighted songs and $800,300 for everything else, for a combined $2,300,300 in hybrid statutory and Trobaugh damages.

### V-3: Other Relief Requested

88.    In addition to the award of damages, I also ask the Court to award declaratory relief that the Defendant did in fact infringe on twenty-one (21) of my copyrights, and that these infringements were all intentional. The latter declaration is prerequisite to awarding me statutory damages fo more than $30,000 per copyrighted work. See 17 USC § 504(c).

89.    I also ask the Court to issue an injunction ordering the Defendant to cease and desist his infringement of my copyright.

### V-4: The Court should publish its judgment in the Federal Supplement

90.    In addition to entering default judgment in my favor, I also believe the Court should publish its opinion, admonishing the extremely weak case for fair use and the level of entitlement and smugness the Defendant displayed while insisting that it was fair use despite how weak of a case it is.

91.    Earlier in this memorandum, in ¶ 30 above, I provided a paragraph that I believe succinctly sums up the situation we're in. I believe that this paragraph, or something substantially similar to it, should be included in the Court's published opinion.

92.    As I explained above, this belief about how fair use works, and the level of entitlement the Defendant shows, is not at all unique to the Defendant, but is in fact quite commonplace. Not only that, but this particular brand of infringement (playing 100% of someone else's video and only nominally commenting on it) is an extremely common practice.

93.    In light of this, as I explained above, the Court has a vested interest in stamping this misconception out. A published case law definitively and unambiguously stating that this is in fact not how fair use works, one that laymen copyright holders like myself can show to laymen infringers without having to ask them to "speak to an attorney," and especially one that contains a nice succinct excerpt such as the one in ¶ 30 above that encapsulates the misconception to be debunked, which copyright holders can point to so that laymen infringers won't have to read the entire case, would likely go a long way to stamping out this misconception about fair use once and for all.

94.    In Footnote #2 on Page 12 above, I explained that, as common as this practice is on the Internet, cases involving this practice that actually making it all the way to court are few and far between. So the Court may not get another chance like this one to publish such a helpful case law for a long, long time. The Court should nip this in the bud while it has the chance.

## VI: CONCLUSION

95.    Wherefore, premises considered, I respectfully pray that the Court award default judgment in my favor, order the Defendant to cease and desist his infringement of my copyright, order him to pay statutory damages of $3,150,000, and for any other relief to which I may be entitled.

So requested on this, the 30th day of January, 2025.

*/s/ David Stebbins*
David Stebbins (Pro se)